**ALL LINE, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**RABAR CORP., d/b/a Hooven Allison, Defendant–Appellant, Cross–Appellee.**

**Nos. 89–2419, 89–2541.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1990.

Decided Dec. 4, 1990.

Ann B. Greco, Chicago, Ill. and Alan B. Castator, LaGrange, Ill., for plaintiff.

Roger W. Wenthe, David H. Shipman, and Richard L. Sandler, McDermott, Will & Emery, Chicago, Ill., for defendant.

Before COFFEY and RIPPLE, Circuit Judges, and REYNOLDS, Senior District Judge.[*]

COFFEY, Circuit Judge.

Rabar Corporation appeals an order of the district court awarding All Line, Inc. damages for future profits lost as a result of Rabar's breach of a non-competition agreement, and it also appeals the profit margin used by the district judge to determine the profits. On cross-appeal, All Line challenges the district court's limitation of damages to twenty months after termination of the non-competition agreement as well as the imposition of interest on All Line's past-due invoices. We affirm the district judge's decision dealing with the assessment of interest against All Line on its account with Rabar and the profit margin used to compute All Line's damages from Rabar's breach of contract; we reverse the award of lost future profits.

## I. BACKGROUND

All Line, Inc., a manufacturer and distributor of rope and rope products, is based in Naperville, Illinois. Rabar, also a manufacturer of rope who sometimes supplies rope to All Line, is based in Xenia, Ohio. Little Tikes, a manufacturer of children's toys, at one time was All Line's largest customer but now buys rope directly from Rabar—thus the controversy.

All Line began supplying a variety of rope products to Little Tikes in 1983. In the summer of 1986, All Line began supplying 23–foot–long pieces of ⅜ths–inch poly-

---

[*] The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

propylene rope to Little Tikes for children's swings. Initially, All Line purchased bulk rope from a foreign manufacturer, cut it, sealed the ends, and delivered it to Little Tikes. In the fall of 1986, All Line sought to replace that foreign manufacturer with a more reliable, domestic manufacturer because the foreign manufacturer was supplying an insufficient quantity of rope. James Doherty, All Line's purchasing manager and salesman for the Little Tikes account, contacted Gary Connor, Rabar's vice president of sales and marketing, to inquire whether Rabar could manufacture and supply the rope that All Line needed for Little Tikes (All Line did not provide the identity of their customer during negotiations). On November 26, 1986, Gary Connor met with James Doherty and Rick Moore, All Line's president, in Naperville, Illinois. They agreed that Rabar would manufacture and supply All Line with the rope.

In order to facilitate the manufacture of rope to Little Tikes' satisfaction, All Line believed it would be helpful to introduce Little Tikes to Rabar so the ultimate customer and the manufacturer might work out any technical details. Prior to making the introduction, and as a precondition to purchasing rope from Rabar, All Line required Rabar to agree not to compete for Little Tikes' business. Rabar agreed not to compete with All Line, and on November 28, 1986, Gary Connor sent a letter to All Line embodying the non-competition agreement. The relevant part of the letter reads as follows:

"This letter is a confirmation of my statements during our meeting of November 26, 1986, relevant [sic] to 'non-compete' areas that we will adhere to. Any prospective account that you are working with and one that we are not selling at that time, will not be solicited by any Principal or Agent of Hooven Allison, as long as Hooven Allison is being considered as a possible or existing sub-contractor in conjunction with All–Line, Inc. In addition, if any existing or potential account approaches Hooven Allison on a direct basis, in an attempt to by-pass All–Line, Inc. we will make it clear that we sell through a 'two-step'

structure and that we cannot jeopartize [sic] that structure by selling direct to the end user.

I further agree to furnish you will [sic] copies of any/all · correspondence between Hooven Allison and any account that would fall into the above classification."

The parties agree that this non-competition letter was a binding contract between them. (Indeed, at trial the parties agreed the letter was unambiguous.) In essence, the letter stated that as long as All Line purchased rope from Rabar, Rabar would not sell directly to All Line's customer; if All Line's customer approached Rabar to buy directly, Rabar would notify All Line of the contact and tell the customer that Rabar's contractual relationship with All Line prohibited direct sales from Rabar to All Line customers. It is clear from the language of the letter, however, that it fails to articulate any obligation on the part of All Line or the duration of the agreement.

Shortly after All Line introduced Rabar to Little Tikes, Rabar literally breached the terms of the agreement. In January 1987, Rabar sold a shipment of rope directly to Little Tikes, but when All Line discovered the sale and protested, Rabar invoiced the sale through All Line. In March 1987, Little Tikes contacted Rabar about direct sales. Rabar refused to sell directly at that time. Instead, Gary Connor advised Little Tikes of the two-step procedure set forth in the non-competition letter and that Rabar was obligated to sell to Little Tikes through All Line. Some eight months later, Little Tikes again approached Rabar about direct sales indicating that it was seeking a different source of rope, and it intended to terminate All Line whether Little Tikes found that other source in Rabar or in another manufacturer. Rabar failed to inform All Line of these contacts, and in late 1987 Rabar opened negotiations with Little Tikes about direct sales. As a result of these negotiations, in February of 1988 Rabar began making direct sales to Little Tikes. In this new mode of direct dealing, Little Tikes issued purchase orders to Ra-

bar for bulk rope, and Rabar shipped the rope to a company called Lesko; Lesko cut the rope, shipped it to Little Tikes, and billed Little Tikes directly for the cutting. Little Tikes purchased rope directly from Rabar as well as from All Line until April 13, 1988.

On April 13, 1988, Little Tikes informed All Line that Little Tikes had been buying rope from Rabar directly as well as from All Line and that they now intended to buy through Rabar alone. Because of Rabar's decision to sell directly to Little Tikes in violation of the non-competition agreement, All Line suspended payment to Rabar on invoices amounting to $81,971.

Rabar sent a Mailgram to All Line on April 28, 1988, stating that the letter agreement would be terminated effective May 4, 1988, unless the account was paid or arrangement for payment had been made by that time. All Line responded with a Mailgram on May 4 refusing to pay the debt or to recognize the termination of the non-competition agreement. It professed to view the unpaid debt as partial payment of damages from Rabar's breach of the contract and now asserts that damages continue to accrue. In contrast, Rabar considers the agreement terminated and damages concluded as of May 4, 1988.

All Line sought damages for lost profits from Rabar in the U.S. District Court for the Northern District of Illinois, and Rabar counterclaimed for the balance due from unpaid invoices. After a five-day bench trial, the trial court found that Rabar had breached the letter agreement by making direct sales to Little Tikes before the May 4, 1988 termination. The trial judge awarded lost profits of 20% on these pre-termination sales, stipulated to be $75,639, for a total of $15,128. The district judge further

found that the letter agreement was terminable at will, but because, in his view, the breach prior to termination made Rabar liable for all reasonably ascertainable losses emanating from the breach, he awarded All Line lost profits on Rabar's estimated sales to Little Tikes for the twenty months following termination, the length of time he felt Little Tikes would have continued to purchase rope from All Line. The lost profits from 1988, including the pre-termination damages, were $73,000, and the 1989 lost profits were $120,000, for a total of $193,000. The Judgment Order offset this award with the amount All Line owed Rabar at termination, $81,971, plus $13,034 interest[1] for a total offset of $95,005. When subtracted from the award of damages of $193,000, All Line's net award was $98,095.[2]

## II. DISCUSSION

Rabar challenges the district judge's award of lost future profits and the profit margin used for calculating the pre-termination damages, and it argues that the judgment puts All Line in a better position than it would have occupied absent the breach because Little Tikes would have terminated All Line regardless of Rabar's conduct. Thus the award of future lost profits constitutes punishment rather than compensation. On cross-appeal, All Line challenges the district court's limitation of future damages to twenty months—it claims damages should be extended for six years, apparently because the All Line–Little Tikes relationship had already lasted six years. All Line argues that $193,000 is too small a price for Rabar to pay for an account that earns over $120,000 profit per year.[3] All Line also challenges the district

1. The district court applied interest to $66,843, the amount of the unpaid invoices, $81,971, less the judgment for pre-termination sales, $15,128.

2. $193,000 less $95,005 equals $97,995, not $98,-095. In light of our disposition of the lost future profits issue, however, this mathematical error does not affect the outcome.

3. All Line portrays Rabar as a greedy corporation that was not satisfied with its own profits, it wanted All Line's profits as well. The record,

however, paints a different picture. Rabar sold rope to Little Tikes for three cents per pound less than it was charging All Line, which equaled the shipping cost Rabar saved by selling to an Ohio firm. Thus Rabar made the same profit whether it sold to All Line or directly to Little Tikes. Yet Little Tikes apparently received a substantial savings through buying rope directly from Rabar and paying Lesko to cut it. When All Line submitted prices to Little Tikes in an attempt to regain the account, Little

court's application of the 1.5% interest rate to the past-due invoices; under All Line's theory of damages, Rabar owed All Line more than All Line owed Rabar, thus no interest was due.

### A. The Contract

■ The briefs by both parties, as well as their arguments before the district judge and before us, demonstrate more than a little confusion over the nature of the contract and the consideration for the contract at issue. Thus a short discussion of why the agreement at issue constitutes a contract is in order. It is elementary that any contract requires an offer, acceptance, and consideration. Here All Line's offer was in effect, "we will buy rope from you if you promise not to compete with us," and Rabar's acceptance, embodied in the letter agreement, in effect stated, "we will not sell directly to your customer as long as you buy rope from us." Rabar's promise was supported by consideration in the promise to refrain from direct sales, but All Line's promise was illusory because there was no requirement that All Line buy any rope. Indeed, All Line had no obligation to Rabar until a further contract was formed—a purchase order for rope from All Line constituting an offer, and an acceptance by Rabar through delivery of the rope (the parties' normal course of dealing). The latter contract, while independent of the non-competition agreement, provided All Line's consideration to support the non-competition agreement. Thus as long as All Line continued to order rope from Rabar, Rabar was liable to All Line for infringing the non-competition agreement. Because each future transaction between All Line and Rabar was executory and optional, the letter agreement's future application was executory and terminable at will. The non-competition agreement would have become ineffective whenever All Line ceased buying from Rabar even without official termination.

The district court properly found that the agreement between the parties was terminable at will. "It has long been the holding of the Illinois courts that when an executory contract fixes no time for its operation, it is terminable at the will of either party and without notice." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 671 (7th Cir.1987), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987) (citations omitted). The contractual relationship between Rabar and All Line involved a series of independent transactions buying and selling rope that were executory until completed. With no written agreement regarding price, volume, or duration, each purchase order and shipment were independent transactions that could be executed at the option of the parties. Because the non-competition agreement was dependent upon All Line's continued purchases of rope from Rabar, the parties' entire relationship fits squarely within the terminable-at-will doctrine. "Under the doctrine of mutuality, such a contract [exclusive distributorship without a stated duration and without an obligation to distribute] in so far as it was executory, could be terminated by defendant *by due notice at any time....*" *Goodman v. Motor Products Corp.*, 9 Ill.App. 2d 57, 68, 132 N.E.2d 356, 362 (2d Dist.1956) (emphasis added). Rabar's six-day notice of termination was adequate to end the non-competition agreement as of May 4, 1988.[4]

All Line objects to the characterization of the agreement as "executory" rather than executed. It asserts that when it introduced Rabar to Little Tikes, it had fully

---

Tikes' response was that the quoted price was over 20% high. Thus when All Line asserts that the account is worth $120,000 per year profit, it is asserting that Little Tikes is saving $120,000 per year by excluding the middle man, All Line.

**4.** Relying on *House of Vision, Inc. v. Hiyane*, 58 Ill.App.2d 431, 208 N.E.2d 390 (1st Dist.1965), the trial judge concluded that an injunction enforcing the non-competition agreement even after termination of the contract would have been

in order if there were no adequately ascertainable money damages available. *House of Vision* is inapplicable to the instant contract, however, because *House of Vision* involved a non-competition agreement that became effective at termination. Rabar's non-competition agreement *ended* at termination because it did not contain a post-termination restrictive covenant. Thus post-termination relief is unavailable.

performed its obligations under the agreement. This assertion is consistent with All Line's theory that the consideration for Rabar's promise not to compete was the introduction of Rabar to Little Tikes. The introduction of Rabar to Little Tikes was without inherent value, however, because the letter agreement failed to restrict All Line's purchasing options. If All Line had found a more economical source of rope the day after introducing Little Tikes to Rabar, All Line could have severed its relationship with Rabar with impunity, and Rabar would have made no sales. Indeed, Rabar's profit in the sales was unrelated to knowing the identity of Little Tikes—there is no evidence suggesting that All Line would buy more rope because of introducing Little Tikes to Rabar. Indeed, at the time, the introduction benefited All Line rather than Rabar because it allowed Little Tikes to work with Rabar in developing rope specifically for Little Tikes without All Line having to act as intermediary. Thus the act of introducing Rabar to Little Tikes fails to constitute a fully executed contract.

All Line also objects to the characterization of the agreement as freely terminable "at will." It argues that if the contract were freely terminable at will, Rabar could have canceled the agreement the day after All Line introduced Rabar to Little Tikes. All Line is correct in this assertion—since there was nothing in the agreement to prohibit All Line from terminating the next day, Rabar had no greater obligation.[5] *See Goodman v. Motor Products Corp.*, 9 Ill. App. 2d 57, 132 N.E.2d 356, 364 (2d Dist. 1956) (contracts without mutually enforceable obligations are unenforceable) and cases cited therein.

### B. Future Lost Profits

*Goodman v. Motor Products Corp.*, 9 Ill.App.2d 57, 132 N.E.2d 356 (2d Dist.1956)

*[Goodman I]*, aff'd after remand, 22 Ill. App. 2d 378, 161 N.E.2d 31 (2d Dist.1959) *[Goodman II]*, sets forth the applicable law on the issue of All Line's future lost profits: The remedy for a breach of a terminable-at-will contract is pre-termination lost profits only. In *Goodman*, Motor Products Corporation and Goodman entered an oral agreement giving Goodman the exclusive right to distribute freezers in foreign countries. There was no requirement that Goodman sell freezers, but as long as he did so, Motor Products Corporation was prohibited from competing with him. *Goodman I*, 132 N.E.2d at 360. The court considered the contract as one terminable at will and unenforceable to the extent it was executory because there was no fixed duration for the contract, and Goodman could cease distributing freezers whenever he chose. *Id.* 132 N.E.2d at 363. Prior to termination, however, Motor Products Corporation began making direct sales into Mexico, thus breaching the agreement. At the first trial, a jury awarded Goodman $130,000 in damages for his lost profits before and after termination. In an unpublished order the trial judge subsequently granted the defendant's motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The appellate court reversed the judgment notwithstanding the verdict and remanded for a new trial. "[T]he issue which was to be submitted to the jury was the amount of damages due the plaintiff as a result of the breach of the distributorship agreement *prior to its termination.*" *Goodman II*, 161 N.E.2d at 36 (emphasis added). The jury verdict at the second trial was $800 for the pre-termination damages.

■ The trial court somehow misread *Goodman* (the judge failed to identify which *Goodman* opinion he was construing) and concluded that it was inapplicable

---

**5.** All Line contends that under *P.S. & E., Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125 (7th Cir. 1972), its efforts in obtaining the Little Tykes account constitutes an investment that it must be allowed to recoup, but the record fails to demonstrate that All Line was inadequately compensated for its efforts. All Line's only other investment was its purchase of special pig-

ment during the developmental stage of Little Tykes' rope. This investment was recouped through price discounts from Rabar designed to offset All Line's investment. All Line made no investment in equipment, in additional manpower, or in training its employees for the purpose of servicing the Little Tykes account. Hence, All Line has no un-recouped investment.

to the instant case. In contrast to the trial judge's reading of the *Goodman* cases, it was the appellate court, not the jury, that limited Goodman's recovery to pre-termination damages. "When this cause was remanded for a new trial, the issue which was to be submitted to the jury was the amount of damages due the plaintiff as a result of the breach of the distributorship agreement *prior to its termination.*" *Goodman II,* 161 N.E.2d at 36 (emphasis added). Thus *Goodman* supports Rabar's argument that Rabar is liable for pre-termination damages only. The agreement between Rabar and All Line was much like the contract in *Goodman* in that it granted All Line an exclusive "distributorship" of Rabar rope products to Little Tikes. While the agreement had an indefinite duration, All Line had no obligation to buy rope from Rabar. Either party could have terminated the agreement at any time, and thus it was unenforceable only to the extent it was executory. As in *Goodman,* Rabar subjected itself to a claim for damages by breaching the agreement and must reimburse All Line for pre-termination damages.

The trial judge erroneously relied upon *Schatz v. Abbott Laboratories, Inc.,* 51 Ill.2d 143, 281 N.E.2d 323 (1972) for the proposition that "All Line is entitled to recover all reasonably ascertainable losses it has suffered *and continues to suffer* as a result of [Rabar's] breach." (Emphasis added.) *Schatz* was a nuisance action for the loss of the use and enjoyment of a residence and the loss of business at a movie theater because of obnoxious odors emanating from defendant's business. The nuisance was an on-going tort with readily ascertainable damages. In contrast, we are of the opinion that the instant case involves an executory contract terminable at will. Because there are no on-going damages after the termination of an executory, at-will contract, *Schatz* is inapposite to the issue of damages in such a contract. The trial judge should have relied upon *Goodman* and denied All Line's request for future lost profits.

### C. All Line's Profit Margin for Pre–Termination Damages

■ The trial judge's decisions to receive evidence on the issue of All Line's profit margin and to apply a 20 percent profit margin to Rabar's pre-termination sales to Little Tikes were an appropriate exercise of discretion. Rabar's objection on appeal states the equitable principle that "factual statements in a pretrial order signed by a party's counsel are judicial admissions which are conclusively binding on the party." That principle is inapplicable here, however, because All Line's claim in the pretrial order that its profit margin was 14.75 percent was followed by a statement that All Line had not yet "been able to ascertain the exact extent of its damages...." This qualification prevents the stated profit margin of 14.75 percent, which was based upon 1987 sales, from limiting All Line to that margin. All Line's actual profit margin depended upon the types of rope Rabar sold directly to Little Tikes (the profit margin varied for different types of rope), and complete information regarding those sales was not available to All Line until trial. The trial court properly overruled Rabar's objection to the admissibility of evidence establishing All Line's profit margin on Rabar's pre-termination sales to Little Tikes because All Line did not limit itself to a 14.75 percent profit margin in the pretrial order.

### D. All Line's Cross–Appeal

■ The above disposition of issues conclusively determines All Line's cross-appeal. All Line contends first that it should recover its lost profits for six years beyond the termination date of the contract. This claim amounts to a claim for consequential damages, a remedy that is unavailable in a contract terminable at will—a contract with no foreseeable duration cannot have foreseeable damages from termination. Furthermore, All Line failed to demonstrate that such consequential damages were in the minds of either party at the time of contracting or that the asserted consequential damages were foreseeable. Second, All Line argues that its damages for future lost profits was greater than the amount it

**482**

owed Rabar for past due invoices, so the district judge should not have assessed interest on the debt. In view of our disposition of the lost profits issue, this claim also must fail, thus the trial judge's assessment of interest was proper.

## CONCLUSION

We affirm the district court to the extent of the $15,128 judgment in favor of All Line for its pre-termination lost profits on Rabar's direct sales to Little Tikes and the $95,005 judgment in favor of Rabar reflected in $81,971 in unpaid invoices plus $13,034 interest. We reverse the district court's award of future lost profits to All Line.