4 F.3d 997
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
ROBINSON-BOCK DISTRIBUTING COMPANY, INCORPORATED, Plaintiff-Appellee,
v.
PIONEER/ECLIPSE CORPORATION, and Smith-Scharff Paper
Company, Incorporated, Defendants-Appellants.
 Nos. 92-2578, 92-2585.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 8, 1993.
Decided Aug. 25, 1993.
 
 1
 Before FLAUM and MANION, Circuit Judges, and ROBERT L. MILLER, Jr., District Judge.*
 
 ORDER
 
 2
 Robinson-Bock Distributing Company ("Robinson") sued Pioneer/Eclipse Corporation ("Pioneer") and Smith-Scharff Paper Company ("Smith," together with Pioneer "defendants") under the Sherman Antitrust Act, 15 U.S.C. Sec. 1.[1] Robinson also sued Pioneer for breach of contract. Robinson claimed it had a contract to distribute Pioneer products. Robinson alleged that Pioneer terminated its distributorship status as a consequence of an antitrust conspiracy between Pioneer and Smith, a company that also distributed Pioneer products. The jury ruled in Robinson's favor on both the antitrust and contract claims, and the court denied the defendants' post-trial motions. The defendants appeal, contending that Robinson did not prove any of its claims as a matter of law. We affirm the contract claim and reverse the antitrust claim.
 
 I. Background
 
 3
 Pioneer and about nine hundred other companies manufacture janitorial supplies, such as floor strippers, sealers, cleaners, and waxes. Pioneer's national market share in the janitorial supply industry is no more than four percent. Pioneer's competitors include Spartan and Buckeye, larger companies that make similar products. Spartan and Pioneer compete "[l]ike dogs and cats." The largest manufacturer of janitorial supplies is Johnson Wax, described at trial as the "nine hundred pound gorilla" of the industry. Johnson Wax is Pioneer's chief competitor. A witness testified that you "[c]an't go wrong with Johnson Wax on your floors."
 
 
 4
 Robinson was established in September 1989 for the purpose of becoming a Pioneer distributor. In mid-1989, Robinson discussed the establishment of a distributorship arrangement with Pioneer. In mid-September, Pioneer advised Robinson that it was approved as a "distributor's kit," which included a "Confidential Distributor Chemical Products Price List" and a "Suggested Initial Order for New Distributor" form. Robinson then entered into a lease for premises in Kansas City, Missouri. Robinson also forwarded to Pioneer a proposed Articles of Incorporation to become an Illinois corporation, because Pioneer had requested that Robinson incorporate. Illinois later granted Robinson a corporate charter, and Missouri granted the company the authority to do business in Missouri. In mid-September 1989, Robinson placed two orders with Pioneer totalling approximately $60,000.00. Pioneer promptly filed the order, to which Robinson made a partial payment. In early October 1989, Robinson received three memoranda from Pioneer that were sent to all Pioneer distributors. In late October, Ernie Leger sent Butch Reeves, both of Pioneer, a memorandum indicating why Robinson had been established as a distributor.
 
 
 5
 Kenneth Mink was one of Robinson's two shareholders. Robinson projected its initial annual sales at $130,000.00. Robinson planned to sell Pioneer products mainly to Astro Building Services ("Astro"), which Ken Mink also owned. Astro is a contract cleaner that provides complete building maintenance services (supplying the chemicals, machinery, and labor) for department store chains. Before the establishment of Robinson, Astro purchased Pioneer products from Smith.
 
 
 6
 One of Astro's customers was Target Stores ("Target"), a discount chain. Target specified in its contract with Astro that Astro should use Pioneer products to clean its stores. Target's allegiance to Pioneer products was not ironclad. In 1989, Pioneer had a "major product problem with one particular floor finish." Target decided to test products made by other manufacturers. As a result, because of the faulty product, Pioneer lost an entire division of Target. Pioneer's business was reduced to one-fifth of the Target stores. Of Astro's other customers, about one half specified the sole use of Pioneer products.
 
 
 7
 Problems began for the fledgling Robinson toward the end of October 1989. Bob's Janitorial, a Pioneer distributor in Kansas, with a warehouse about fifteen miles away from Robinson's operation, met with Robinson and informed Robinson that it would sue to get Robinson out of its territory.
 
 
 8
 Smith was also displeased with the establishment of Robinson as a distributor. Smith was one of Pioneer's "top five" distributors. Between 1987 and 1989, Smith annually sold approximately $560,000.00 in Pioneer products. On October 31, 1989, Smith sent Pioneer a letter regarding Pioneer's distributorship arrangement with Robinson. Smith expressed its "extreme dissatisfaction" with Pioneer. Smith reminded Pioneer that it had an implied promise of an exclusive distributorship relationship with Pioneer in the greater St. Louis area. Smith stated that Astro, Robinson's sole customer, was located in Smith's exclusive territory and was a current customer of Smith's. Smith also conveyed that it had contacted Bob's Janitorial and that Bob's Janitorial was "quite upset" and was considering legal action against Pioneer.
 
 
 9
 According to Smith, the establishment of Robinson was "a sham operation and while [Robinson] may have in its mind an eventual establishment of business in the Kansas City area, nevertheless, its primary thrust is to bypass [Smith] and to buy [Pioneer's] products direct, on behalf of Ken Mink and Astro." Smith also noted that "[o]bviously, if Mr. Mink is allowed to proceed this way then [Pioneer] can expect to have no loyalty from its distributors like [Smith] across the country." As a suggested solution, Smith proposed that Pioneer immediately inform Robinson that Pioneer would have no further business contacts with Robinson and would no longer sell it Pioneer products. Smith warned Pioneer that unless such action was taken, Smith's business relationship with Pioneer would be endangered and Smith might take legal action against Pioneer.
 
 
 10
 On November 1, 1989, the day after receiving Smith's letter, Pioneer sent a letter to Robinson. In the letter, Pioneer pointed out that Robinson appeared to be a "front" for Astro and that Pioneer had made a decision in the past not to sell directly either to contractor's or to any organization not served as a "front" for a contractor. Pioneer explained: "To sell directly to end users would be a disservice to our distributors and we just do not want to distribute our products in that fashion." Pioneer regretted not being able to set Robinson up as a direct distributor, and it concluded the letter by stating: "We feel that this is a business decision in our best interest. We must remain loyal to our distributor network for the future growth and security of [Pioneer]." In a November 3, 1989, telephone call between Kenneth Mink and Butch Reeves of Pioneer. Reeves indicated that Pioneer was "not going to go through with the distributorship that [Robinson] wanted and the way he worded it was as if [Robinson] had never had it." Pioneer then sent Robinson an invoice for its September shipments. Smith later contacted Mink to inform him that under the circumstances Smith and Astro, Mink's other company, should cease doing business together.
 
 
 11
 In early 1990, Pioneer and Robinson contacted each other. Robinson convinced Pioneer that it was not a "front" for Astro and that it wanted to establish a true distributorship. Pioneer informed Robinson that it would reinstate it as a distributor for the Kansas City area only if Robinson personally guaranteed payment of its outstanding balance of approximately $35,000.00 from the September shipments. Pioneer did not require a personal guarantee when Robinson had first discussed becoming a distributor. Robinson refused to extend the personal guarantee, and Pioneer declined to reinstate Robinson as a distributor. About one month later, Robinson shut down its business operations.
 
 
 12
 Robinson then brought an antitrust action against both Pioneer and Smith and also sued Pioneer for breach of contract. In January 1992, the case went to trial, with the jury deciding in Robinson's favor. The jury found that a contract existed between Pioneer and Robinson and that Pioneer breached the contract, causing Robinson damages in the amount of $31,900.00. The jury also found that Pioneer and Smith had conspired and that their conspiracy injured competition. The jury awarded Robinson $50,000.00 on the antitrust claim. The district court later trebled the antitrust award pursuant to section 4 of the Clayton Act, 15 U.S.C. Sec. 15. The total award to Robinson, including attorneys' fees and court costs, was $187,894.10.
 
 
 13
 The defendants filed post-trial motions with the district court, arguing that as a matter of law Robinson should not have prevailed on any of its claims. The district court denied the motions, and the defendants filed this timely appeal.
 
 II. Analysis
 
 14
 We have jurisdiction, 28 U.S.C. Sec. 1291, to consider the two points the defendants raise on appeal: First, whether Robinson made a submissible antitrust case of either an injury to competition in a relevant market or a conspiracy; second, whether Robinson made a submissible case of breach of contract and whether Robinson proved its damages with a reasonable degree of certainty.
 
 A. Standard of Review
 
 15
 Our standard of review is whether the evidence, viewed in a light most favorable to Robinson, provides a sufficient basis from which the jury could have reasonably reached a verdict without speculation or without drawing unreasonable inferences that conflict with the undisputed facts. Allen & O'Hara, Inc. v. Barrett Wrecking, Inc., 898 F.2d 512, 515 (7th Cir.1990). Pioneer and Smith did not challenge any of the court's evidentiary rulings or the jury instructions. The thrust of their contention on appeal is that the district court should not have allowed the case to go to the jury, but should have instead ruled in their favor as a matter of law.
 
 B. Unreasonable Restraint of Trade
 
 16
 Robinson alleged that Pioneer and Smith had engaged in a specific course of conduct that constituted an unreasonable restraint of trade and caused Robinson damages. 15 U.S.C. Sec. 1. In other words, Robinson advanced a claim of a vertical nonprice restraint of trade.
 
 
 17
 The parties agree that the rule of reason applies to this case. Under the rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[2] Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 (1977). "A threshold inquiry in any Rule of Reason case is whether the defendant had market power, that is, the 'power to raise prices significantly above the competitive level without losing all of one's business.' " Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 666 (7th Cir.), cert. denied, 484 U.S. 977 (1987). "[T]he purpose of establishing market power is to determine whether the defendant can control the market and thus affect competition." Id.
 
 
 18
 Robinson's theory at trial was that the relevant product market was the market for Pioneer products sold to Target. It based its theory on the fact that Target in its contract specified that Astro use Pioneer products to clean its stores. Robinson claimed that Pioneer had one-hundred percent of the market in the Target region. The assumption here is that no readily available substitutes existed for Pioneer products or that Target was so loyal to Pioneer products that it would not accept any other janitorial supply product, regardless of a significant price increase by Pioneer above that of the competition. See, e.g., Eastman Kodak Co. v. Image Technical Servs., Inc., 112 S.Ct. 2072, 2090 (1992); Valley Liquors, 822 F.2d at 666, 668.
 
 
 19
 The evidence showed that the janitorial supply industry is highly competitive. Approximately nine hundred companies vie with one another for a share of the market. Pioneer competes with other companies, such as Spartan and Buckeye, that sell similar products. Johnson Wax, "the nine hundred pound gorilla" of the industry, is Pioneer's main competition. According to one witness, you "[c]an't go wrong with Johnson Wax on your floors." As such, Target had several comparable companies to choose from before it selected Pioneer. For whatever reason, Target chose Pioneer. Yet, nothing indicates that Target would continue to demand Pioneer products if Pioneer raised the price of its products significantly above that of its competition. (No one from Target testified at trial.) This is not a situation where only one product could do the job of cleaning Target stores. See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 488 (5th Cir.1984) (stating that a single-product market "is without merit as a matter of law, because absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market").
 
 
 20
 If Pioneer did raise its prices well above its competitors, the rational business decision by Target would be to choose from among the other nine hundred janitorial supply companies and select a comparable product at a lower price. As noted at trial, Pioneer and Spartan compete "[l]ike dogs and cats." Nothing indicates that if Target dropped Pioneer, no other janitorial supply company, for example Spartan, could replace Pioneer. See Valley Liquors, 822 F.2d at 668; see also United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 393 (1956) (noting that one product does not necessarily make up a relevant market if substitute products are accessible).
 
 
 21
 Target has shown in the past that it is not blindly loyal to Pioneer products. After Pioneer had a "major product problem with one particular floor finish," Target dropped Pioneer and ultimately switched to products by other manufacturers. Such behavior on the part of Target does not show it to be a diehard consumer of a single product nor does it show that Pioneer products are without their substitute. It represents a rational business decision based on economic realities. If a product does not do a certain job, abandon it, and get another product that does the job. It follows then that Target would have had no problem in dropping Pioneer if Pioneer significantly raised its prices. Target would have then simply required the use of another manufacture's product that was both comparable in quality and lower in price. That only makes sense. Target is a discount store. For it to keep its prices low, Target must keep such things as overhead down. As an economic decision, Target would no doubt go with the lower priced yet comparable product. Robinson has pointed to nothing in the record that leads to a contrary conclusion. See Valley Liquors, 822 F.2d at 668-69; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (pointing out that economic reality must be considered in an antitrust case); Reiter v. Sonotone Corp., 442 U.S. 330, 342 (1979) (noting that consumers act rationally in seeking the lowest possible price). In short, Robinson should not have succeeded on its theory at trial. Without market power, Pioneer could not have had an adverse impact on competition. Valley Liquors, 822 F.2d at 666.
 
 
 22
 In addition, we agree with Pioneer that the relevant market here was the janitorial supply industry as a whole. Within that relevant market, Pioneer had no market power because its national market share was no more than four percent. Valley Liquors, 822 F.2d at 666 ("Market share analyses in section 1 cases have led to conclusions that approximately 70%-75% of market share constitutes market power, and that a 20%-25% market share or less does not constitute market power.") (citations omitted). Thus, because Pioneer did not have market power in the relevant market, there was no unreasonable restraint of trade.
 
 C. Antitrust Conspiracy
 
 23
 Robinson also alleged that Pioneer and Smith engaged in an antitrust conspiracy. Section 1 of the Sherman Antitrust Act precludes "[e]very ... conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. Sec. 1. Robinson showed that Smith sent Pioneer a letter complaining about Pioneer's decision to establish Robinson as a distributor. Smith threatened legal action against Pioneer and also threatened to end their business dealings. The day after Pioneer received the letter, Pioneer terminated its distributorship arrangement with Robinson.
 
 
 24
 Allowing a conspiracy to be inferred solely "from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 763 (1984). "[S]omething more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." Id. at 764.
 
 
 25
 As the Fourth Circuit has pointed out, "Monsanto holds that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints. One reason is to avoid losing the business of disgruntled dealers." Garment Dist., Inc. v. Belk Stores Servs., Inc., 799 F.2d 905, 909 (4th Cir.1986), cert. denied, 486 U.S. 1005 (1988). No matter that the complaints express dismay or constitute economic duress, coercion, or threats, id., the terminated party "must present evidence 'that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." ' Id. at 910 (quoting Monsanto, 465 U.S. at 768). "Monsanto emphasizes that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints, notwithstanding the harm to competition that results." Id. "[T]he critical element in the Monsanto analysis is not what motivates the distributors to complain, but rather what motivates the manufacturer to terminate discounters in response to these complaints." Id.
 
 
 26
 With this background in mind, we conclude that Robinson failed to establish an antitrust conspiracy. The overriding inference to any evidence Robinson presented was the independent decision Pioneer made to maintain its business relationship with Smith (as well as with Bob's Janitorial) at the expense of Robinson. From a purely business standpoint, keeping Smith and dropping Robinson made sense. Between 1987 and 1989, Smith was one of Pioneer's "top five" distributors. Its annual sales of Pioneer products hovered around $560,000.00. In contrast was the fledgling Robinson, in existence about two months, without a successful track record and with a projected first years sales figure of $130,000.00. Kenneth Mink, the co-owner of Robinson also owned Astro, Robinson's primary customer and user of Pioneer products. Pioneer perceived this arrangement as a "front" set up to bypass purchasing from a distributor. This would violate Pioneer's policy of not selling products directly to a contractor or to the "front" of that contractor. As Pioneer pointed out in the November 1, 1989, letter to Robinson: Pioneer regretted not being able to establish Robinson as a direct distributor, but it was "a business decision in [Pioneer's] best interest. [Pioneer] must remain loyal to [its] distributor network for the future growth and security of Pioneer." See, e.g., Monsanto Co., 465 U.S. at 764; Valley Liquors, 822 F.2d at 660-64; Belk Stores Servs., 799 F.2d at 909-10. Thus, Pioneer and Smith did not engage in an antitrust conspiracy. Pioneer's decision to terminate Robinson was based on an independent business decision. Moreover, because no unreasonable restraint of trade existed, no antitrust conspiracy could have existed either.
 
 D. Contract, Breach, and Damages
 
 27
 In addition to the antitrust violation, the jury found that a distributorship contract existed between Pioneer and Robinson, that Pioneer breached the contract, and that Robinson's damages as a result of the breach were $31,900.00. In seeking to reverse the jury's decision, Pioneer claims that Robinson did not establish a breach of contract case and did not prove its damages with any reasonable degree of certainty. Pioneer raises three main arguments.
 
 
 28
 First, Pioneer argues that no contract existed between it and Robinson. Nevertheless, by its own admission on appeal, in early 1990 it was willing to reinstate Robinson's distributorship had Robinson personally guaranteed that it would pay Pioneer its outstanding debts. If Pioneer was willing to reinstate the distributorship, then a distributorship had to have existed. Pioneer's claim, therefore, that there was no contract between itself and Robinson falls by the wayside. Besides, enough evidence was presented for the jury to have found the existence of a distributorship agreement between Pioneer and Robinson. The two parties discussed the matter. Pioneer approved Robinson as a distributor. Robinson placed orders, which Pioneer filled. Robinson paid for those orders, in part,[3] and Pioneer sent Robinson memorandums directed to its distributors.
 
 
 29
 Second, citing All Line, Inc. v. Rabar Corp., 919 F.2d 475 ??. Pioneer argues that any contract between itself and Robinson was terminable at will without notice, because the contract would have been executory, with no continuing obligation on either party to do future business with each other. Id. at 479 (" 'It has long been the holding of the Illinois courts that when an executory contract fixes no time for its operation, it is terminable at the will of either party and without notice.' "). Although Pioneer advances a correct legal principle under Illinois law, which the parties agree controls this contract question, Pioneer cannot use it as a basis for reversing the district court. At the instruction conference, Pioneer proposed the following jury instruction, which the district court accepted and read to the jury: "A contract with no definite term is terminable at will with reasonable notice." (Emphasis added.) Pioneer obviously did not object to the giving of its proffered instructionand must adhere to it as part of the law of the case. See Fed.R.Civ.P. 51; see also 9 Charles A. Wright & Arthur R. Miller, Federal Practice And Procedure Sec. 2553, at 639; Sec. 2558, at 668, 670-71 (1971). Even on appeal, Pioneer has not challenged the accuracy of any of the instructions presented to the jury.
 
 
 30
 Although the jury instruction Pioneer submitted informed the jury that the contract was terminable with reasonable notice, it did not inform the jury which party had the burden of proving such notice. (The instruction apparently was given to the jury after it had been instructed on each of the three counts, with the contract count being the first.) It also did not define for the jury the meaning of reasonable notice, which can mean different things. As such, the jury was not given much guidance in resolving whether reasonable notice was given. Nevertheless, the jury determined that Pioneer had not given Robinson reasonable notice that it intended to terminate the distributorship arrangement. Possibly, the jury could have determined that the obscure statement in the November 1, 1989, letter from Pioneer to Robinson, that Pioneer regretted not being able to set up Robinson as a distributor--even though Pioneer had already done so and had filled two orders--was not reasonable notice of termination. Thus, based on the evidence and the instructions given, we affirm the jury's decision that Pioneer breached its contract with Robinson.
 
 
 31
 Third, Pioneer contends that Robinson did not prove its damages with any reasonable degree of certainty. The law of damages was presented to the jury in the instructions, to which Pioneer did not object. The jury was instructed that after it found for Robinson on the question of liability, it was to award Robinson any lost profits that resulted from the breach. Lost profits were defined as lost net profits, that is, the difference between gross profits and the expense of operating the business. Kenneth Mink testified about Robinson's damages. He testified to Robinson's lost net profits as a result of Pioneer's breach. Pioneer did not present any evidence to counter either Mink's testimony or the exhibits Robinson introduced regarding its lost profits. Instead, Pioneer cross-examined Mink, made certain objections, and attempted to convince the jury that Mink was not a credible witness. (The district court's evidentiary rulings are not on appeal.) Despite Pioneer's efforts, the jury believed Mink. Its finding that Robinson's lost net profits were $31,900.00 is reasonable, in light of the evidence and the instructions given.
 
 III. Conclusion
 
 32
 We conclude that there was no proof of market power and no proof of a conspiracy. Therefore, we REVERSE the district court on the antitrust claim and REMAND with instructions for the court to enter judgment in favor of Pioneer and Smith. We also conclude that based on the jury instructions and the evidence, the jury had a sufficient basis on which to determine the existence of a contract, a breach, and damages. Accordingly, we AFFIRM the district court on the contract claim.
 
 
 
 *
 Hon. Robert L. Miller, Jr., District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 Other parties were involved in this lawsuit, but they do not take part in this appeal and will not be discussed
 
 
 [2]
 In contrast, [p]er se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49-50 (1977)
 
 
 [3]
 Robinson admits owing $34,000.00 to Pioneer for the orders. A counterclaim judgment has been entered against Robinson for the outstanding amount