**MID–AMERICA TABLEWARES, INC.,**
d/b/a **Royal Dinnerwares,**
**Plaintiff–Appellee,**

v.

**MOGI TRADING CO., LTD.,**
**Defendant–Appellant.**

No. 96–1843.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 4, 1996.

Decided Nov. 22, 1996.

Edwin J. Hughes (argued), Joseph P. Wright, Stafford, Rosenbaum, Rieser & Hansen, Madison, WI, for Plaintiff–Appellee.

Marcia E. Goodman, James C. Schroeder (argued), Mayer, Brown & Platt, Chicago, IL, Douglas Yokomizo, Monteleone & McCrory, Los Angeles, CA, for Defendant–Appellant.

Before CUMMINGS, COFFEY and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

In May 1994, Mid–America Tablewares, Inc. d/b/a Royal Dinnerwares ("Mid–America") entered into a contract with Mogi Trading Company, Ltd., whereby Mogi was to provide dinnerware for Mid–America's new Harvest Festival dinnerware line. The Harvest Festival dinnerware line was intended to complement Mid–America's pre-existing Harvest Festival table linen line. Shortly after Mogi shipped the dinnerware to the United States in July and August of 1994, the Food and Drug Administration determined that the dinnerware exceeded FDA regulatory guidance levels for leachable lead. In the ensuing litigation between the parties, Mogi stipulated to liability for breach of warranty and the case proceeded to trial on the issue of damages only. Mogi's Rule 50(a) motion for judgment as a matter of law on the issue of future lost profits at the close of Mid–America's case was denied and not renewed at the close of all evidence. The jury returned a special verdict awarding Mid–America $311,353 for lost revenues from 1994 sales of Harvest Festival dinnerware and $57,734 as compensation for incidental expenses incurred by Mid–America as a result of Mogi's breach. Additionally, the jury awarded Mid–America $2,655,752 as compensation for lost profits on sales of Harvest Festival dinnerware after 1994, and $131,960 for lost profits on sales of Harvest Festival table linens after 1994. The district court entered judgment in accordance with the jury's special verdict. Thereafter, the district court denied Mogi's post-trial renewed motion for judgment as a matter of law on future lost profit issues or in the alternative for a new trial. The district court entered an amended judgment (awarding Mid–America enhanced interest and double costs under Wis. Stats. §§ 807.01(3) and (4) as a consequence of Mogi's rejection of Mid–America's settlement offer) on March 6, 1996. Mogi now timely appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction, the denial of several evidentiary motions, and the denial of Mogi's renewed motion for judgment as a matter of law on lost profit issues or in the alternative for a new trial. For the reasons that follow, we affirm in part, reverse in part, and remand for a new trial.

## I. BACKGROUND

Mid–America is a Wisconsin corporation with its principal place of business in Eau Claire, Wisconsin. In late 1993, Mid–America's president, Daniel Hemmerich, decided to produce and sell a dinnerware line to accompany its Harvest Festival table linen line, which had enjoyed success during 1993. The Harvest Festival linen line consists of

tablecloths and napkins printed in a fall/Thanksgiving motif including turkeys, pumpkins, and fallen autumn leaves. Hemmerich sought a manufacturing source for the dinnerware and was given Mogi's name. Mogi is a Japanese corporation with its principal place of business in Japan and is in the business of, among other things, contracting for the manufacture and sale of ceramic dinnerware. However, Mogi itself does not manufacture ceramics.

On December 28, 1993, Hemmerich faxed a letter to Masaichi Tsuchiya, Mogi's Director Senior Merchandise Manager, who is responsible for Mogi's export activities. Hemmerich's letter stated that he was in the process of developing a dinnerware project and was very interested in discussing Mogi "sourcing" (*i.e.,* arranging for the manufacture of) the dinnerware line for him. Tsuchiya responded by fax the next day. In his letter, Tsuchiya discussed some advantages of utilizing a Japanese, rather than Chinese or Indonesian, manufacturer; he also provided some general information about price, quantity, and shipping. Tsuchiya concluded his first correspondence with Hemmerich by noting, "I have a plan to be in states in early Feb '94[.] [S]o I can be there before 2/7 or after 2/13 if necessary." Hemmerich responded later that day, stating, among other things: "I will be in the office from Feb. 13th on, and would very much like to meet with you. Please feel free to make our home yours should you be able to come to Eau Claire."

On December 31, Tsuchiya faxed Hemmerich another letter asking a variety of production and shipping questions. In particular, Tsuchiya inquired, "Where to ship, either your warehouse or customer direct[?]" Tsuchiya also noted, "At this stage I can leave for Wisconsin on 1/12 from St. Louis." In a return fax transmitted later that day, Hemmerich answered Tsuchiya's inquiry about shipping, stating "Ninety five percent of the ware will be shipped into my warehouse." Mid–America's warehouse is located at the company's headquarters in Eau Claire.

In the following days and months, Hemmerich and Tsuchiya continued to correspond about various aspects of the Harvest Festival dinnerware line as well as other potential prospective business dealings. In an early January 1994 exchange of faxes, Hemmerich and Tsuchiya discussed quantity, shipping, and delivery plans for the Harvest Festival dinnerware. After Hemmerich presented a proposed schedule, Tsuchiya responded that the proposed schedule seemed manageable, and he quoted the following schedule: "1st order ... latest to arrive at your warehouse by 8/13[.] 2nd order ... latest to arrive at your warehouse by 9/20."

Also, in the early January exchanges, Hemmerich emphasized the importance of complying with lead regulations and instructed Tsuchiya to ensure that any ware Mogi sources for Mid–America falls well within the lead release standards for all states other than California (which had enacted uniquely strict lead release standards). Hemmerich requested that Mogi provide a certificate of compliance listing the lead content for any ware Mogi sources, and he stressed, "I cannot take any chances with lead. If any ware exceeds the limit I would be sued for all [Mid–America] is worth and then some. I WILL NOT GAMBLE ON LEAD PROBLEMS." In a return fax a few days later, Tsuchiya discussed the lead issue generally and specifically represented that "our goods always are under FDA standard, if over, Japanese government not ... allow to ship."

Tsuchiya met with Hemmerich in Eau Claire over the course of three days in mid-February 1994. Hemmerich and Tsuchiya spent February 14, 1994 at Mid–America's offices in Eau Claire, at which time Tsuchiya saw Mid–America's warehouse. Tsuchiya brought samples of some of Mogi's products (e.g., mugs, bath products, and different dinnerware products) with him and he displayed these products to Hemmerich. Hemmerich attested that Tsuchiya also attempted to interest him in a new dinnerware product resembling bone china that Mogi could develop and source. Hemmerich also attested that throughout his three-day visit, Tsuchiya solicited Mid–America's business.

In May 1994, Mid–America faxed Mogi an order for dinnerware and Mogi accepted the offer by return fax. Under the terms of the contract, the sale was F.O.B. Nagoya, Japan and Mid–America was responsible for all

freight, duties, and insurance from that point forward. Mogi delivered the goods to carriers in Nagoya during July and August 1994 and received payment in Japan under a letter of credit. At Mid–America's request the goods were shipped to Minneapolis, Minnesota. The containers holding the goods were shipped ocean freight to Seattle, Washington and then came overland to the customs clearinghouse in Minneapolis. After the goods cleared customs, they were trucked to their ultimate destination, Mid–America's warehouse in Eau Claire, Wisconsin, where the containers were unsealed and unpacked.

On August 16, 1994, Mid–America was informed by an FDA representative that the FDA had tested a Harvest Festival fruit/salad bowl and found that the bowl exceeded FDA guidelines for leachable lead. Further testing confirmed that the bowls indeed exceeded FDA lead limits. Hemmerich informed Mogi of the lead problem and requested Mogi to ship 348 replacement bowls directly to Mid–America in Eau Claire. Samples of the replacement bowls were also tested by the FDA and found to exceed lead limits. Subsequent testing by the FDA of all Harvest Festival products revealed unacceptably high lead levels in six different Harvest Festival sets or pieces. Upon being informed of the FDA's test results of October 1994, Mid–America stopped shipping dinnerware to its customers and began the process of recalling all the Harvest Festival dinnerware that had already been shipped.

Mid–America sued Mogi in the United States District Court for the Western District of Wisconsin, invoking the court's diversity jurisdiction. Mogi stipulated to liability for breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.[1] The case proceeded to trial on damages issues only. Prior to trial, Mogi filed a motion *in limine* to exclude any evidence, testimony, or argument relating to lost profits in any year other than 1994. Mogi also filed a pretrial motion *in limine* to exclude the testimony of Mid–America's

damages expert, John Nevin, as a consequence of Mid–America's failure to provide Nevin's opinions in its initial expert report as required by Fed.R.Civ.P. 26(a)(2)(B). The district judge denied both motions.

Following the trial, the jury returned a special verdict awarding Mid–America $311,353 for lost revenues from 1994 sales of Harvest Festival dinnerware; $57,734 for incidental expenses resulting from Mogi's breach; $2,655,752 for lost future profits on sales of Harvest Festival dinnerware; and $131,960 for lost future profits on sales of Harvest Festival table linens. Judgment was entered in accordance with the special verdict. Mogi appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction, the denial of several evidentiary motions, and the denial of Mogi's renewed motion for judgment as a matter of law on lost profit issues or in the alternative for a new trial.

In order to illuminate our rulings in this case, summaries of pertinent trial testimony are contained in the Appendix to this opinion.

## II. DISCUSSION

### 1. *Personal Jurisdiction*

The determination of personal jurisdiction is a question of law that we review *de novo*. *Klump v. Duffus*, 71 F.3d 1368, 1371 (7th Cir.1995), certiorari denied, —— U.S. ——, 116 S.Ct. 2523, 135 L.Ed.2d 1047. The framework for that determination is well established. "A federal district court exercising diversity jurisdiction has personal jurisdiction over a nonresident [such as Mogi] 'only if a court of the state in which it sits would have such jurisdiction.' " *Id.* (quoting *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1243 (7th Cir.1990), certiorari denied, 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468). The Wisconsin Supreme Court has held that personal jurisdiction over a defendant exists when (1) the defendant is subject to jurisdiction under the Wisconsin long-arm statute and (2) exercising jurisdiction under the statute does not violate the

---

**1.** Mid–America voluntarily dismissed its claims for intentional misrepresentation, strict liability misrepresentation, strict liability, and negligence.

due process requirements of the Fourteenth Amendment of the federal constitution. *In re All–Star Ins. Corp.*, 110 Wis.2d 72, 76, 327 N.W.2d 648, 650 (1983). The plaintiff has the burden of proving that personal jurisdiction exists. *State ex rel. N.R.Z. v. G.L.C.*, 152 Wis.2d 97, 104, 447 N.W.2d 533, 535 (1989); *Lincoln v. Seawright*, 104 Wis.2d 4, 9, 310 N.W.2d 596, 599 (1981). And, as we have recently noted, "[t]he Wisconsin Supreme Court has determined that its long-arm statute is to be liberally construed in favor of the exercise of jurisdiction." *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 391 (7th Cir.1994). Furthermore, that court has concluded that its long-arm statute "was intended to provide for the exercise of jurisdiction over nonresident defendants to the full extent consistent with the requisites of due process of law." *Flambeau Plastics Corp. v. King Bee Mfg. Co.*, 24 Wis.2d 459, 464, 129 N.W.2d 237, 240 (1964); see also *Daniel J. Hartwig Assocs., Inc. v. Kanner*, 913 F.2d 1213, 1217 (7th Cir.1990).

■ Our inquiry thus begins by considering whether Mogi is subject to jurisdiction under the Wisconsin long-arm statute. Mid–America maintains, and the district court held, that the exercise of personal jurisdiction over Mogi is authorized by § 801.05(5)(e) of the Wisconsin Statutes. The district court did not err in this regard. Section 801.05(5)(e) provides:

> A court of this state having jurisdiction of the subject matter has jurisdiction over a person served in an action ... under any of the following circumstances:
>
> \*    \*    \*    \*    \*    \*
>
> (5) LOCAL SERVICES, GOODS OR CONTRACTS. In any action which:
>
> \*    \*    \*    \*    \*    \*
>
> (e) Relates to goods, documents of title, or other things of value actually received by the plaintiff in this state from the defendant without regard to where delivery to carrier occurred.

WIS. STAT. § 801.05(5)(e). By its plain language, this section applies to actions involving goods actually received by the plaintiff in this state from the defendant regardless of where delivery to a carrier took place. This action falls squarely within that language. It is uncontroverted that the shipping containers containing the Harvest Festival dinnerware were packed and sealed in Nagoya, Japan and were ultimately unsealed and unpacked at Mid–America's warehouse in Eau Claire, Wisconsin.

Mogi concedes as it must that because the long-arm statute focuses on the place where goods are "actually received," not where title passed, the fact that the dinnerware was sold F.O.B. Nagoya, Japan is of no consequence. Instead, Mogi argues that Mid–America did not receive the goods in Wisconsin *from* Mogi because Mogi did not ship any goods to Wisconsin; rather, as directed by Hemmerich, Mogi shipped the goods to Minneapolis (which was the closest and most convenient customs port of entry to Eau Claire), at which point they were trucked to Wisconsin after clearing customs.[2] This argument ignores the long-arm statute's directive that the site of actual receipt is to be determined "without regard to where delivery to carrier occurred." The fact that the goods in this case experienced a number of stopovers and transfers as they made their way from Nagoya through Seattle to Minneapolis and finally to Eau Claire does not alter the conclusion that when Mid–America unpacked and unsealed the goods in Eau Claire, they were received in Wisconsin from Mogi. Accordingly, § 801.05(5)(e) provides for personal jurisdiction over Mogi in this action.

Having determined that Mogi is properly subject to jurisdiction under § 801.05(5)(c), it is necessary to consider whether the exercise of personal jurisdiction comports with due process requirements of the Fourteenth Amendment. Due process requires that in order for a non-consenting nonresident defendant to be subject to a State's personal

---

**2.** Although it is not clear from the record, it appears from Mid–America's brief that Mogi made the shipping arrangements from Nagoya to Minneapolis and Mid–America selected the carrier that would transport the goods from Minne-apolis to Eau Claire. See Appellee's Brief at 13. For purposes of applying the statute, we find no legal significance in the fact that Mid–America selected the carrier for the last leg of the trip.

jurisdiction, the defendant must have "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). This "constitutional touchstone" of minimum contacts requires that "'the defendant's conduct and connections with the forum State are such that he should reasonably anticipate being haled into court there.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). In defining when a potential defendant should reasonably anticipate out-of-state litigation, the Supreme Court has repeatedly drawn on its statement in *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283: "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." See, *e.g., Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183; *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 109, 107 S.Ct. 1026, 1030, 94 L.Ed.2d 92. As the Court explained in *Burger King:* "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" 471 U.S. at 475, 105 S.Ct. at 2183 (citations and footnote omitted).

■ When Mogi's contacts with Wisconsin are considered in light of the foregoing standards, it is readily apparent that subjecting Mogi to personal jurisdiction in Wisconsin comports with due process. Mogi's contacts with Wisconsin can hardly be said to be random, fortuitous, or attenuated. First, it is undisputed that Mogi directed a number of faxes to Hemmerich in Wisconsin. Mogi's faxes contained not only recommendations about sourcing the dinnerware and information about price, quantity, and shipping, but also specific representations and assurances about the quality of the dinnerware (most notably Mogi's representation that the dinnerware would comply with federal lead standards). Additionally, the record reveals that during this period of initial discussions, Mogi sent various sample products directly to Mid–America in Eau Claire via Federal Express or airmail for Hemmerich's inspection and approval. See Hemmerich Aff. para. 22; *id.* Ex. 14 (Mogi invoice reflecting 1/13/94 Federal Express shipment of sample pieces).

Second, at the very outset of discussions between Mid–America and Mogi (indeed, in the very first fax sent from Mogi to Mid–America), Mogi's senior merchandise manager, Tsuchiya, volunteered to meet with Hemmerich in Wisconsin. Hemmerich took up the offer and Tsuchiya came to Wisconsin for three days in February 1994. Although Mogi attempts to downplay the significance of this visit as nothing more than an opportunity for Hemmerich and Tsuchiya to get acquainted with one another, this contention is belied by both the record and common sense. Hemmerich did not contact Mogi in search of a pen-pal; he sought a business relationship and Tsuchiya's visit to Wisconsin—during which he viewed Mid–America's warehouse and office facilities, displayed sample Mogi products to Hemmerich, and had preliminary discussions concerning Mid–America's design concept—was clearly designed to consummate that relationship. Certainly, there is no reason in the record to reject Hemmerich's statement that Tsuchiya's visit was critical to Mid–America's decision to source Harvest Festival dinnerware through Mogi.

Third, the record unambiguously reveals that Mogi was aware that the Harvest Festival dinnerware it shipped was destined for Mid–America's warehouse in Eau Claire. In a fax dated December 31, 1993, Tsuchiya inquired whether the goods were to be shipped directly to customers or to Mid–America's warehouse. Hemmerich's reply on the same day stated that "[n]inety five percent of the ware will be shipped into my warehouse." Approximately two weeks later, in response to an order and shipment schedule proposed by Hemmerich, Tsuchiya

proposed the following schedule: "1st order date by 4/15 & ship date 7/15 latest to arrive at your warehouse by 8/13. 2nd order date by 5/20 & ship date 8/20 latest to arrive at your warehouse by 9/20." Thus, although Hemmerich instructed Tsuchiya to deliver the goods via Minneapolis, there is no doubt that Tsuchiya understood that the goods were bound for Mid–America's warehouse in Eau Claire.

Finally, after it was determined that the Harvest Festival fruit/salad bowls exceeded leachable lead standards, Hemmerich requested that Mogi replace them. Mogi shipped 348 replacement bowls by air directly to Mid–America in Eau Claire. These replacement bowls also exceeded acceptable lead standards.

Viewed collectively, the foregoing facts clearly establish that Mogi purposefully directed its efforts toward Mid–America in connection with the Harvest Festival dinnerware transaction. Mogi transmitted faxes and sent sample products into Wisconsin over the course of approximately five to six months as part of the process of developing the Harvest Festival dinnerware to Hemmerich's satisfaction and consummating the sale to Mid–America. Mogi's conduct in this regard was not random, fortuitous, or attenuated. Rather, it reflected a purposeful effort to obtain Hemmerich's business. The fact that Mogi engaged in this conduct through mail and telecommunications from abroad does not detract from the appropriateness of exercising personal jurisdiction over Mogi. "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184. Moreover, in this case, Mogi did have physical contacts with Wisconsin by virtue of Tsuchiya's three-day business trip to Eau Claire, which must be considered in

conjunction with Mogi's other efforts toward obtaining Mid–America's business. Hemmerich attested that Tsuchiya's three days of preliminary discussions with him were critical to his decision to enter into a contract with Mogi. As this Court has repeatedly recognized, "a defendant's participation in substantial negotiations conducted in the forum state leading to the contract at issue is a significant basis for personal jurisdiction." *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 581 (7th Cir.1994); see also *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1216 (7th Cir.1984) (finding that discussions in Illinois leading to contract formation supported jurisdiction in Illinois); *Neiman v. Rudolf Wolff & Co., Ltd.*, 619 F.2d 1189, 1193–1194 (7th Cir.1980) (finding that a lunch meeting in forum during which important terms were discussed supported jurisdiction), certiorari denied, 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148; *Wisconsin Elec. Mfg. Co. v. Pennant Prods., Inc.*, 619 F.2d 676 (7th Cir. 1980) (holding that personal jurisdiction over defendant existed where defendant's only contacts with forum were two visits to plaintiff's facilities). Moreover, by coming to Eau Claire and engaging in preliminary discussions over a three-day period, Mogi (through Tsuchiya) invoked the benefits and protections of Wisconsin law; at a minimum, Wisconsin provided police and fire protection for Tsuchiya during his visit to Mid–America's facilities. *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1364 (7th Cir.1985) (noting that Wisconsin provided police and fire protection to buyer's agent who came to Wisconsin to inspect goods prior to shipment).

■ We emphasize that by discussing its contacts with Wisconsin in isolation and suggesting that none alone establishes the requisite minimum contacts, Mogi fails to appreciate that the minimum contacts inquiry is one that examines the totality of the circumstances. See *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas S.A.*, 51 F.3d 1383, 1388 (8th Cir.1995) ("In determining whether there is personal jurisdiction, the courts consider the defendant's contacts with the forum in the aggregate, not individually, they look at the totali-

ty of the circumstances.") (collecting cases). Mogi's contacts with Wisconsin taken collectively plainly establish that Mogi possessed sufficient minimum contacts to sustain jurisdiction.

■ Finally, *Asahi* counsels that we must evaluate whether exercising personal jurisdiction in this case is reasonable (*i.e.*, comports with traditional notions of fair play and substantial justice) by considering the following five factors: (1) the burden on the defendant of having to litigate in the forum; (2) the interests of the forum; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several States in furthering fundamental substantive policies. 480 U.S. at 113, 107 S.Ct. at 1033. As *Asahi* makes clear, the burden imposed on a foreign defendant who is forced not only to travel a great distance but also to litigate in a foreign nation's judicial system is quite great and should be given significant weight in the reasonableness determination. *Id.* at 114, 107 S.Ct. at 1033. However, the Court also noted, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* That observation holds true in the instant case. In the first place, this was hardly a complex case. Mogi stipulated to liability and in defense of its position on damages Mogi called only two witnesses, neither of whom was from Japan. While we do not gainsay the burden imposed on Mogi in having to litigate in the United States, any concerns about the difficulties of litigating in a foreign nation's legal system are of diminished significance in this case. On the other side of the balance, Mid–America's interest in obtaining convenient and effective relief is substantial, and Wisconsin plainly has an interest in providing relief to its citizens who have been injured by a nonresident's breach of contract. Moreover, where, as here, the breach involved the shipment of goods posing a serious health hazard into the State, Wisconsin's interest is augmented. "Wisconsin has a compelling interest in regulating the conduct of manufacturers that expose Wisconsin residents to the hazards of defective products." *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 668 (7th Cir.1986), certiorari denied, 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158. Thus, it is clear that the interests of Mid–America and Wisconsin in the exercise of jurisdiction outweigh the burden on Mogi and justify jurisdiction. Finally, Mogi has not identified any substantive or procedural policies of Japan that are affected by the assertion of jurisdiction in this case, and we discern none. For all of these reasons, the exercise of jurisdiction over Mogi was proper in this case.[3]

### 2. *Motions in Limine*

■ Before considering Mogi's substantive motions, the Court must briefly consider the district court's denial of Mogi's two motions *in limine:* (1) to exclude any evidence of lost profits for any year other than 1994, and (2) to exclude the testimony of John Nevin, Mid–America's damages expert. The district court's evidentiary rulings are reviewed under the abuse of discretion standard. *Briggs v. Marshall*, 93 F.3d 355, 361 (7th Cir.1996). Under Wisconsin law, damages for breach of contract include those damages arising from the breach and must "reasonably ... be supposed to have been within the contemplation of both parties at the time they made the contract as the probable result of the breach of it.'" *Reiman Assocs., Inc. v. R/A Advertising, Inc.*, 102 Wis.2d 305, 320, 306 N.W.2d 292, 300 (Wis. App.1981) (quoting *Foss v. Heineman*, 144 Wis. 146, 149, 128 N.W. 881, 883 (1910)). The determination as to whether future profits were within the contemplation of the parties when contracting necessarily turns on the specific facts established at trial. It was not error to allow Mid–America to put on its evidence supporting the inference that it was

---

**3.** Mogi finds fault with the district court's refusal, after ruling on Mogi's pretrial motion to dismiss, to entertain any further evidence or argument on the jurisdictional issue at trial. Because the record presented to the district court in con-

nection with Mogi's pretrial motion fully supported a finding of jurisdiction by a preponderance of the evidence, there was no reversible error in the district court's decision.

within Mogi's contemplation that future lost profits to Mid–America could reasonably result from a breach by Mogi. There is no basis to conclude that evidence as to the foreseeability of Mid–America's lost future profits should be excluded as a matter of law, and the cases cited by Mogi do not support such a broad proposition.[4] Similarly, Mogi's argument that Mid–America could not prove its lost profits with reasonable certainty is an argument that goes to the sufficiency of Mid–America's evidence. While this might be a proper argument for summary judgment or for judgment as a matter of law, it is not a proper basis for a motion to exclude evidence prior to trial. The district judge acted well within her discretion in allowing Mid–America to put on its evidence of lost future profits.

▮▮▮▮ Nor did the district court abuse its discretion in denying Mogi's motion to exclude testimony by Mid–America's damages expert, Dr. Nevin, as a Rule 37(c)(1) sanction for Mid–America's failure to disclose Nevin's opinions in its initial Rule 26(a)(2) expert witness report, which was subsequently supplemented to include Nevin's opinions. The sanction of exclusion under Rule 37(c)(1) is "automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless." *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir.1996). The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court. *Id.* at 1231. The

district court was unpersuaded by Mogi's claims of prejudice—prejudice which Mogi itself characterizes as difficult to quantify or pinpoint—and we can discern no basis for upsetting that exercise of discretion. Although Mogi complains that Mid–America's late disclosure severely shortened the time for Mogi's expert, Professor Meadows, to formulate his opinion, there is no basis for concluding that the delay materially impacted on his ability to formulate his opinions in this case. Nor did the district judge abuse her discretion in determining that Mogi had sufficient time to prepare for Dr. Nevin's deposition after receiving Mid–America's supplemented expert opinion report. There is no other discernible basis for concluding that Mogi was prejudiced by Mid–America's tardy disclosure. Accordingly, the district court did not abuse its discretion in denying Mogi's motion for sanctions.

### 3. *Mogi's Motion for Judgment as a Matter of Law*

▮▮▮▮ At the close of Mid–America's case, Mogi moved for judgment as a matter of law "on the issue of lost future profits." In support of its motion, Mogi argued that there was insufficient evidence that either the Harvest Festival dinnerware or table linens would have yielded any profit for any year beyond 1994. The district court cut short Mogi's counsel's argument on the speculative and uncertain nature of future profits, stating that there was "evidence from which the jury could find that the dinnerware col-

---

4. Mogi relies on *All Line, Inc. v. Rabar Corp.*, 919 F.2d 475 (7th Cir.1990), for the proposition that because its contract with Mid–America was essentially terminable-at-will (Mid–America had no obligation to purchase from Mogi in the future and Mogi had no obligation to sell to Mid–America in the future), Mid–America's damages must be limited to its 1994 damages. *All Line* simply does not support such a proposition. *All Line*, a case decided under Illinois law, held that the damages available as a result of a breach of a non-compete clause in a terminable-at-will contract are limited to pre-termination lost profits only. *Id.* at 480. The underlying rationale was that "there are no on-going damages after the termination of an executory, at-will contract." *Id.*, 919 F.2d at 481. Here, however, we are dealing with consequential damages arising from the breach of an executed contract and it was well within the district judge's discretion to per-

mit the introduction of evidence bearing on whether Mogi's breach caused lost future profits that were reasonably within the contemplation of the parties. Similarly, *Chrysler Corp. v. E. Shavitz & Sons*, 536 F.2d 743 (7th Cir.1976), does not support Mogi's position that in view of its ad-hoc relationship with Mid–America, future lost profits are unavailable as a matter of law. The question presented in *Shavitz* was whether Chrysler, which breached a contract to provide air conditioning equipment, had reason to know at the time of contracting with the plaintiff of certain lost business opportunities that arose some time after the defendant's breach. The Court concluded that it did not. *Id.*, 536 F.2d at 744–745. Here Mid–America properly sought to prove that its future lost profits were reasonably within Mogi's contemplation at the time of contracting.

lection would sell over future years." The court also denied the motion as to future linen profits. We review the district court's denial of Mogi's motion for judgment as a matter of law *de novo. Grassi v. Information Resources, Inc.,* 63 F.3d 596, 599 (7th Cir.1995). We begin by considering whether Mogi's motion was properly preserved. As was just noted, Mogi moved for judgment as a matter of law at the close of Mid–America's case; however, Mogi did not renew its motion at the close of all evidence. This Court gives effect to the plain language of Rule 50(b) by requiring that a motion for judgment as a matter of law be made at the close of all evidence in order to be preserved for post-trial consideration. *Umpleby v. Potter & Brumfield, Inc.,* 69 F.3d 209, 212 (7th Cir.1995) (affirming district court's denial of post-trial motion for judgment as a matter of law where defendant had moved for judgment at the close of plaintiff's evidence but had not renewed the motion at the close of all evidence); *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1139–40 (7th Cir.1994) ("[W]e follow the plain language of the Rule and affirm the district court's conclusion that [defendant] was precluded from seeking j.n.o.v. because it failed to renew its directed verdict motion at the close of all the evidence."). Although Mogi contends that the reasoning supporting this Court's determination that a Rule 50 motion must be renewed at the close of all evidence cannot withstand scrutiny, we decline to revisit the wisdom of that determination. As this Court has observed in the past, "compelling reasons are required to overturn Circuit precedent.

'Stare decisis is of fundamental importance to the rule of law ... and has even greater force when the precedent in question involves a statutory construction.'" *E.E.O.C. v. Metropolitan Educ. Enters., Inc.,* 60 F.3d 1225, 1228 (7th Cir.1995) (quoting *Hilton v. South Carolina Public Railways Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 563–64, 116 L.Ed.2d 560) (citations omitted), certiorari granted, —— U.S. ——, 116 S.Ct. 1260, 134 L.Ed.2d 209. Furthermore, Mogi's reliance on *Urso v. United States,* 72 F.3d 59 (7th Cir.1995), for the proposition that the plain language of Rule 50(b) should be disregarded when the Rule's purpose has been served, is misplaced. *Urso* did not involve the issue presented here and therefore is not controlling. In *Urso,* a panel of this Court considered the merits of a Rule 50(b) motion despite the fact that the government failed to support it with argument. Because the government had "forcefully presented" its arguments on the issue before and during trial and because the district court addressed the merits of the motion-apparently considering the motion not to have been forfeited, the panel considered the motion preserved for appeal despite the Rule's requirement that such a motion be supported by argument. We do not read *Urso* as a repudiation of the express holdings in *Downes* or *Umpleby,* neither of which is even mentioned, let alone rejected, in *Urso.* Accordingly, we conclude that Mogi's motion for judgment as a matter of law has not been properly preserved and therefore affirm the district court's denial of Mogi's motion for judgment as a matter of law.[5]

**5.** While recognizing that this Court has read Rule 50 strictly to require the renewal of a Rule 50 motion at the close of all evidence, the district court nevertheless erroneously considered Mogi's motion on its merits. In so doing, the district court relied on certain observations by Professors Wright and Miller in their *Federal Practice and Procedure* treatise. It is significant to note, however, that the panel of this Court which decided *Downes* (and held that a Rule 50 motion must be renewed at the close of all evidence) was well aware of Wright & Miller's observations; in fact, the very section relied on by the district court is cited in the *Downes* opinion in connection with the panel's discussion of this Court's *former* treatment of the Rule, under which the failure to renew a motion for judgment made at the close of the plaintiff's case was not necessarily treated as fatal. *Downes,* 41 F.3d at 1139.

Immediately after this citation, the panel determined that the plain language of the Rule should be followed. Thus the district court's reliance on Wright & Miller was misplaced. The district court also explained that "[w]hen defendant moved at the close of plaintiff's case for judgment as a matter of law on plaintiff's entitlement to any future lost profits, plaintiff had ample warning that defendant was asserting the insufficiency of plaintiff's evidence on this issue." This, of course, will always be true in cases where the defendant moves for judgment at the end of plaintiff's case-in-chief but not at the close of all evidence—which was precisely the case in *Downes* and *Umpleby.* Nevertheless, the clear rule articulated in those cases is that the motion for judgment must be renewed at the close of all the evidence. The fact that Mogi put on one of

■ Even if the Court were to consider Mogi's motion for judgment as a matter of law on its merits, we would affirm the district court's denial of that motion. Under Wisconsin law, a party that has suffered a breach of contract may recover future lost profits if they were within the contemplation of the parties when contracting and if they can be established with reasonable certainty. *Reiman Assocs., Inc. v. R/A Advertising, Inc.,* 102 Wis.2d 305, 323–324, 306 N.W.2d 292, 302 (Wis.App.1981); see also Wisconsin Jury Instructions–Civil 3725. Mogi's core argument in support of its motion for judgment as a matter of law is that because the Harvest Festival line never got off the ground, Mid–America's future lost profit damages cannot be ascertained with any degree of certainty and are entirely speculative.

■ Wisconsin case law is silent on the issue of whether a new or unestablished business may recover lost profits. A leading treatise on the issue reports that what was once a generally accepted rule precluding lost profits damages for a new business has become the minority view and "[t]he development of the law has been to find damages for lost profits of an unestablished business recoverable when they can be adequately proved with reasonable certainty." Robert L. Dunn, *Recovery of Damages for Lost Profits* § 4.2 at 280 (collecting cases). As should be evident, this statement of the rule for unestablished businesses is completely harmonious with Wisconsin's general rule regarding recovery of lost profits—indeed, it is simply a specific application of that general rule. Thus, as an initial matter, there is no basis for concluding that Mid–America is precluded from recovering lost future profits as a matter of law merely because it is a new or unestablished business.

The difficulty for new businesses, as this case amply illustrates, is proving their lost future profits with the requisite degree of "reasonable certainty." Significantly, to avoid the harsh consequences that may result from an overly rigid application of the "reasonable certainty" requirement, courts frequently invoke a number of modifying principles, most notably, "Where the defendant's wrong has caused the difficulty of proof of damages, he cannot complain of the resulting uncertainty" and "If the best evidence of the damage of which the situation admits is furnished, this is sufficient." Charles T. McCormick, McCormick Handbook on Damages § 27 at 101.[6] See, *e.g., Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038 (2d Cir.1992); *David Sloane Inc. v. Stanley G. House & Assocs., Inc.,* 311 Md. 36, 40–41, 532 A.2d 694, 696 (1987); *Miller v. Allstate Ins. Co.,* 573 So.2d 24, 27 & n. 4 (Fla.App.Ct. 1990), review denied, 581 So.2d 1307 (Fla. 1991). The Wisconsin Supreme Court noted these (and other) modifications approvingly in *Thorp Sales Corp. v. Gyuro Grading Co.,* 111 Wis.2d 431, 443 n. 6, 331 N.W.2d 342, 349 n. 6 (1983); and, applying Wisconsin law, this Court invoked the principle that the breaching party cannot complain of uncertainty in *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1372 (7th Cir.1990) (citing *Thorp Sales*); see also *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 383 (7th Cir.1986) ("Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer."), certiorari denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765.

These principles are commonly invoked by courts allowing recovery of future lost profits

---

its two witnesses out of order during Mid–America's case-in-chief does not alter the conclusion.

**6.** McCormick derives the first principle from the Supreme Court's opinion in *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544, wherein the Court stated:

Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and there-

by relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

by new or unestablished businesses. See, e.g., *Chung v. Kaonohi Center Co.,* 62 Haw. 594, 606, 618 P.2d 283, 291 (1980) (allowing recovery of lost profits by a restaurant that never opened and stating "it would be grossly unfair to deny a plaintiff meaningful recovery for lack of a sufficient 'track record' where the plaintiff has been prevented from establishing such a record by defendant's actions"); *Welch v. United States Bancorp Realty & Mortgage Trust,* 286 Or. 673, 704–05, 596 P.2d 947, 963–64 (1979) (allowing recovery of lost profits by unestablished business and observing that expert testimony as to plaintiff's expected returns was all that could be expected under the circumstances and that to require more "would be tantamount to holding that the defendant could breach this particular contract with impunity"); *Fera v. Village Plaza Inc.,* 396 Mich. 639, 648, 242 N.W.2d 372, 376 (1976) (affirming award of lost profits by store that never opened and noting that precision in the assessment of damages is not required "[p]articularly ... where it is defendant's own act ... that has caused the imprecision"). In *Super Valu Stores, Inc. v. Peterson,* 506 So.2d 317, 327–30 (Ala.1987), the Alabama Supreme Court allowed recovery of lost profits by a grocery store that never opened. After reviewing a number of cases involving unestablished businesses, the Court summarized the state of the law as follows:

> [T]he weight of modern authority does not predicate recovery of lost profits upon the artificial categorization of a business as "unestablished," "existing," or "new" particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits. Instead the courts focus on whether the plaintiff has adduced evidence that provides a basis from which the jury could with "reasonable certainty" calculate the amount of lost profits. As held in *Fera* and *Chung* the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.

*Id.,* 506 So.2d at 330.

█ Guided by the foregoing principles, it is apparent that the district court properly

determined that Mogi was not entitled to judgment as a matter of law on the issue of lost future profits. Although this case presents a close call, Mid–America's evidence on the issue of whether the Harvest Festival line would have yielded future profits, which was the best available evidence under the circumstances, was sufficient to support a reasonable finding in the affirmative. First and foremost, the evidence established that a number of buyers from some of the country's largest retail chains embraced the Harvest Festival dinnerware with enthusiasm and uniformly believed that it would be a success. Although, as Mogi successfully brought out during cross-examination, the only way anyone could know with absolute certainty whether the line would have been successful in the marketplace would be if the line actually made it on to the shelves for an adequate period of time to gauge consumers' reaction, the law does not require this sort of absolute certainty. Collectively, the buyers who testified in this case had approximately 80 years of relevant experience. By its nature, the job of a retail buyer involves assessing consumer receptivity to new products and where, as here, the informed judgments of seven experienced buyers converged in the view that the line would have been a success, a jury could rely on that collective judgment to infer that there was a reasonable certainty that Mid–America would have realized some amount of future profits. And, of course, there was more. No less than four of the buyers (representing Dayton Hudson, Carson Pirie Scott, Dillards, and Kitchen Etc.) testified that they intended to promote the Harvest Festival dinnerware "front and forward" in their stores. Thus, above and beyond mere optimism regarding the line's potential, there were aggressive marketing plans in place designed to realize the potential envisioned for the line. Mid–America's damages expert, Dr. Nevin, testified that such marketing efforts "would dramatically affect the sales success of these products." Taken together, this evidence could support an inference that the Harvest Festival line would have enjoyed some measure of success in the future.[7]

---

7. Even George Meadows, Mogi's damages expert, acknowledged that "there clearly were lost

To the extent that Mogi contends that the amount of future profits (as opposed to the fact of future profits) is too speculative and uncertain, the argument fails. The requirement that future profits must be proved with reasonable certainty particularly applies to the fact of damages. As the leading treatise on the issue of lost profits explains:

[T]he [reasonable certainty] rule applies only to the *fact* of damages, not to the *amount* of damages. Proof of the fact of damages in a lost profits case means proof that there would have been some profits. If plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery. But once this level of causation has been established for the *fact* of damages, less certainty (perhaps none at all) is required in proof of the *amount* of damages. While the proof of the *fact* of damages must be certain, proof of the *amount* can be an estimate, uncertain or inexact.

Robert L. Dunn, *Recovery of Damages for Lost Profits* § 1.3 at 11. It is particularly in the area of quantifying the amount of lost profits that courts impose the risk of uncertainty on the breaching party whose breach gave rise to the uncertainty. See, *e.g., Olympia Hotels,* 908 F.2d at 1372; *Sir Speedy,* 957 F.2d at 1038; *Fera,* 396 Mich. at 648, 242 N.W.2d at 376; see also Wisconsin Jury Instructions–Civil 3725 ("If the wrong itself is of such a nature to preclude the ascertainment of the amount of damages with certainty, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference or estimation, although the result may be only approximate."). Here Mid–America presented the jury with testimony concerning the sales levels achieved by other dinnerware lines as well as Harvest Festival sales projections made by Nevin based, among other things, on certain pre-litigation projections made by Hemmerich. Additionally, Mid–America's industry expert, Mr. LaReau, testified that he found Nevin's projections to be reasonable for a successful line. Although more detailed sales data from other dinnerware lines could have greatly assisted the jury in fixing a proper amount of

profits." He merely criticized Dr. Nevin's calcu-

damages, Nevin testified that such data is proprietary information. Thus, under the circumstances, Mid–America's evidence amounted to the best available evidence and there was a sufficient showing to permit the jury to arrive at a reasonable estimate of Mid–America's damages. For the foregoing reasons, Mogi was not entitled to judgment as a matter of law on the lost future profits issue.

### 4. *Motion for New Trial*

In the alternative to its motion for judgment as a matter of law, Mogi moves for a new trial pursuant to Rule 59. The district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Winger v. Winger,* 82 F.3d 140, 143 (7th Cir.1996). A new trial may be granted where "'the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party.'" *Id.* (quoting *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 516 (7th Cir.1993)); *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 636 (7th Cir.1996). The determination that Mid–America presented sufficient evidence to withstand Mogi's motion for judgment as a matter of law does not preclude a finding that the jury's actual verdict was excessive for purposes of Rule 59. *Rousseau v. Teledyne Movible Offshore, Inc.,* 812 F.2d 971, 972 (5th Cir.1987), certiorari denied, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56; *Roebuck v. Drexel Univ.,* 852 F.2d 715, 736 (3d Cir.1988).

A review of the evidence in this case compels the conclusion that the jury's award of $2,655,752 for lost future profits on sales of Harvest Festival dinnerware after 1994 is "monstrously excessive" and finds no rational basis in the evidence. To the contrary, the trial testimony in this case revealed that there has never been a fall or Thanksgiving-themed dinnerware pattern that enjoyed anywhere near the kind of success that the jury apparently envisioned for the Harvest Festival line. Mid–America's industry expert, Charles LaReau, testified that he could only recall three fall/Thanksgiving-themed lines that survived on the market for more

lation of those profits.

than 5 years continuously. Although La-Reau indicated that these patterns survived on the market variously for approximately 25 to 40 years, not one of these three lines ever achieved annual sales greater than $150,000. While other patterns discussed by LaReau did enjoy multi-million dollar annual sales, those lines were not fall or Thanksgiving-themed and bore no similarity in pattern to the Harvest Festival pattern.

The second fundamental infirmity with the jury's $2,655,752 lost future profits award lies in the extreme degree of speculation that must have been indulged in order to arrive at such an award. Plainly, the size of the jury's award in this case can only be understood as resting on one speculative inference heaped upon another. Indeed, Professor Nevin's lost profit projections reflect precisely this speculative process.[8] In the first place, the projections begin with a lost sales figure for 1994 which assumes that every single piece of Harvest Festival dinnerware purchased from Mid–America would have sold. This was certainly a bold assumption in view of the fact that virtually every witness professed an inability to determine whether Harvest Festival would have been a success in 1994. Also, Nevin's projections assume near exponential growth in sales for the next two years, with sales reaching $3 million by 1998. (As far as discernible from his testimony, Nevin's figures reflect little more than an adoption of Hemmerich's sales forecasts, with a little bit of trimming here and there.) Finally, notwithstanding the fact that no similarly themed dinnerware pattern had ever achieved annual sales greater than $150,000, Nevin assumed $3 million annual sales for another five years through the year 2003. Of course, the assumption of ten years of success for a line of this sort introduces yet another weakly supported speculation into the formula. Significantly, Nevin readily acknowledged that his sales projections for the years 1999 through 2003 were not supported by any particular evidence. Rather, in light of the *absence* of any evidence relating to sales after five years, he erroneously held sales constant at $3 million.

Each one of these steps in the estimation of Mid–America's lost profits involves a substantial leap of faith (and, in the case of years 1999 through 2003, outright guessing); and taken collectively, which they must be to arrive at this sizable award, they render the award unreasonably speculative, excessive and unsupported by the evidence. Under the circumstances, the Third Circuit's remarks in *Roebuck v. Drexel Univ.*, 852 F.2d 715 (3d Cir.1988), in which the court affirmed the grant of a new trial because the verdict was against the weight of the evidence, are particularly apropos:

> We must also acknowledge the extraordinary number of inferences that the jury must have drawn in order to reach the verdict that it did. Although we believe that each of the inferences that we have discussed are individually logically sound, we recognize that at some point too many inferences become mere speculation; this verdict plainly comes very close to that line.

*Id.* at 736.

As this Court observed in *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1229 (7th Cir.1995), "we take seriously the responsibility of an appellate court to review the sufficiency of the evidence to support the award of damages." In the present case, it was not unreasonable, in light of the evidence, for the jury to award Mid–America some damages for lost future profits; however, an award of $2,655,752 for lost dinnerware profits based on a ten-year projection of success unparalleled by a similar product cannot be supported by the present record. Accordingly, it is necessary to reverse the district court's denial of Mogi's motion for a new trial and remand for further proceedings.

█ The jury's award of $131,960 for lost future profits from sales of Harvest Festival table linens appears to have been premised on the assumption that the dinnerware's projected success would bolster falling linen sales. The record reflects that 1993 gross

---

8. The jury's award of $2,655,752 for lost future dinnerware profits is only approximately $360,-000 less than Professor Nevin's ten-year projec-

tion—a difference of about $36,000 per year—which suggests that the jury's calculation of damages substantially tracked Professor Nevin's.

linen sales by Mid–America amounted to $204,539.34 and 1994 sales amounted to $140,381.61—a decline of approximately 31 percent. Moreover, of Mid–America's top six 1993 linen purchasers (whose purchases accounted for approximately 89 percent of Mid–America's sales), four (Bergners, Strawbridge & Clothier, Rich's, and Woodward & Lothrop) did not reorder for 1994, and the other two substantially reduced their orders—General Mills, which ordered $46,849.17 of Harvest Festival linens in 1993, ordered only $8,368.64 in 1994, and Dayton Hudson Corp., which ordered $47,398.90 of linens in 1993, ordered only $3,236.80 in 1994. Despite this declining sales history, Professor Nevin projected annual sales of $150,000 for Harvest Festival linens for 1995 through 2003, reflecting, among other things, his belief that the dinnerware line's success would lead to tie-in sales of linen. Insofar as the jury's determination as to lost profits from dinnerware sales cannot stand, its determination regarding lost future profits from linen sales, which is dependent on the former determination, must be reversed as well.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

## APPENDIX

At trial, Mid–America put on the testimony of president Hemmerich, an industry expert, a damages expert, and seven buyers who had placed Harvest Festival dinnerware orders for retail and catalog sales. Hemmerich testified that the Harvest Festival dinnerware line was based on the table linen line, which had enjoyed success in first year sales. He also testified that he developed the dinnerware line in consultation with experienced buyers and merchandise managers, that it was intended to be a collectible line with accessory and accent pieces added over the years, and that he successfully obtained first-year orders for the line from major department stores, specialty stores, catalog outlets, and independent stores.

Charles LaReau testified as Mid–America's industry expert. LaReau had a 40–year career in the dinnerware industry, which included serving as the president of a major dinnerware producer named Johnson Brothers. When Wedgewood Inc. bought out Johnson Brothers, LaReau became Director of U.S. operations for Wedgewood. In 1981, LaReau left Wedgewood to become Executive Vice–President of International China Company, where he worked until his retirement in 1988. LaReau testified about the sales levels of a number of successful dinnerware lines with which he was familiar. For instance, LaReau referenced two lines he introduced into the market while working at the International China Company. "Heartland" was a collectible line introduced in 1982, which had wholesale sales of approximately $1 million the following year and had annual wholesale sales of approximately $20 million by 1987. "Marmalade," also a collectible line, obtained annual wholesale sales of $14 million within about 5 years after its release. LaReau also testified about the success of Johnson Brothers' "Friendly Village" collectible line, which was introduced in 1953. When LaReau left Johnson Brothers in 1981, Friendly Village was enjoying approximately $3 million in annual sales. Of several Johnson Brothers dinnerware lines discussed by LaReau, he considered the Friendly Village line to be "the closest thing" to the Harvest Festival line.

Based on his experience in the industry and his review of Hemmerich's testimony, the depositions of several buyers who had placed Harvest Festival orders, and the projections of Mid–America's damages expert, LaReau opined that it was reasonable to expect that the Harvest Festival dinnerware line would have reached annual sales of $3 million by 1988.

When asked why he considered such an estimate to be reasonable, LaReau stated:

> because I've seen where [the line was] placed. I've seen the product which I think is very attractive and that's about the pace that would evolve if you've got it placed and it retails the first year. Then people who have it are going to increase their orders the following year.... [T]hen you'll get other accounts on it because of the history of the product. (Transcript at 2–B–129).

During cross-examination, LaReau acknowledged that the reasonableness of the projections concerning future sales of Harvest Festival dinnerware was premised on the assumption that Harvest Festival would have been a successful collectible dinnerware line. When asked whether that assumption was "a big if," LaReau answered, "Life is, yes." LaReau testified that a period of two years of sales experience would establish the potential of a dinnerware pattern. LaReau also acknowledged that there is no set life that one can attribute to a dinnerware line; some go on for ages and others never make it at all, and the fact that a line is designed as a collectible line does not ensure success in the marketplace. Both Johnson Brothers and International China Company came out with "a fair number" of patterns that only lasted one year on the market despite premarketing confidence in their success.

LaReau further conceded on cross-examination that Johnson Brothers' Friendly Village dinnerware—the line he considered most similar to the Harvest Festival line-was a different pattern than the Harvest Festival line, and that with lines like these, market success depends upon the particular design or artwork.[1] LaReau also conceded that Friendly Village and Harvest Festival were sold in different sized sets and were manufactured by different production methods— Friendly Village was a print with the ink actually printed into the plate which was then glazed, whereas Harvest Festival used a decal that was applied to the plate. Also, LaReau acknowledged that the Friendly Village line had been on the market for approximately 30 years before building up to a level of $3 million in annual sales.

LaReau's testimony revealed that the Friendly Village, Marmalade, and Heartland lines were not specifically Thanksgiving-themed lines, as was Mid–America's Harvest Festival line. LaReau testified that over the course of his 40 years in the industry, he could only recall three Thanksgiving-themed

dinnerware lines that were on the market for more than five years continuously: "His Majesty," "Welcome Home," and "Barnyard King"—all of which were Johnson Brothers lines. The His Majesty line featured a multi-color print with fruit and pumpkins along the border and a domestic turkey in the middle. LaReau testified that in the approximately 25 years that the His Majesty dinnerware was on the market, annual sales never exceeded $150,000. Johnson Brothers offered the Barnyard King line—which was a "short line" (not a collectible line) consisting of a platter, plate, cup and saucer—from the 1930s to sometime in the 1970s. Like His Majesty, the Barnyard King line featured a turkey in the center of the plate; however, a wild rather than domestic turkey was displayed. Barnyard King's annual sales never exceeded $100,000. LaReau stated that the Welcome Home line, which was on the market from the 1930s to the 1960s, was the least popular of Johnson Brothers' Thanksgiving-themed lines. It was ultimately discontinued due to its relative unpopularity and production difficulties. LaReau did not testify as to the sales figures for Welcome Home.

Mid–America also put on the testimony of seven buyers who uniformly testified as to their favorable reaction to the Harvest Festival dinnerware line. Jay Weberling, a senior buyer in the housewares division for Dayton Hudson Corporation,[2] testified that when he first saw the Harvest Festival dinnerware, he "loved it" because it contained colors that had been "trendy" in Dayton Hudson's sales area, it had a fall motif that had been identified as popular, and the motif was well characterized on the dinnerware pieces. Accordingly, Weberling decided to purchase the Harvest Festival dinnerware and stock it at all Dayton Hudson's stores. Moreover, Weberling testified that the dinnerware was to be presented "front and forward" within the housewares department, which means that the line would be dominantly presented, upfront in the department. With respect to future sales, Weberling testified that because

1. Vickie Donnell, a Carson Pirie Scott buyer who testified on behalf of Mid–America, also testified that the Harvest Festival dinnerware "was a completely different look than Friendly Village."

2. Weberling testified that during the relevant time period Dayton Hudson Corporation operated 16 Dayton's stores, 21 Hudson's stores, and 22 Marshall Field's department stores.

the Harvest Festival dinnerware was on the shelves so briefly before being recalled, he lacked sufficient information to determine how it would be received in the marketplace. He further testified that the Harvest Festival dinnerware may have been on the shelves between one and three weeks but he could not recall with any precision. In that time, Dayton Hudson had sold $335 worth of the merchandise. When asked how successful he thought the dinnerware line would have been absent a recall, Weberling replied that it was his "educated guess ... because of what was trending in different motifs, [that] it would be successful. But the customer is the one that judges if it is, not the buyer." Weberling also testified that Dayton Hudson had not committed to placing any Harvest Festival dinnerware orders in the future; rather, future orders would have been based entirely on 1994 sales.

Similarly, Carson Pirie Scott's[3] Michael Nemoir testified that he believed the line would have been successful had there been no recall. However, Nemoir added that although he expected first year sales to be about $60,000 to $65,000, such an estimate was "merely speculative." When asked if he had an idea as to how long the life of a collectible dinnerware pattern typically would be, Nemoir echoed the sentiment expressed by Weberling, stating, "I don't think I would make a judgment. I think the customer tells you how long the life of a pattern is going to be." With respect to Harvest Festival's actual success before being recalled, Nemoir stated, "I believe the product was out too short a period of time to get any indication as to how well it sold." Carson Pirie Scott had not developed any sales plans for Harvest Festival dinnerware beyond the 1994 fall season; and, like Dayton Hudson, it had made no commitments to purchase any of the dinnerware beyond that season.

Vickie Donnell, a Carson Pirie Scott buyer who worked under Nemoir and who was involved with him in the decision to purchase the Friendly Village dinnerware, testified that she believed the Harvest Festival pattern would "be very strong for us, [and] that it reached a market that we had not reached before." Donnell's testimony also established that it was relatively rare for Carson's to purchase outside of its established group of vendors and that the decision to do so in this case was a product of both the appeal of the line and Carson's prior experience with Hemmerich. Donnell acknowledged that she had not had any experience with a fall-themed dinnerware line similar to Harvest Festival, nor had she prepared any market analysis for the Harvest Festival line or for the fall-themed dinnerware market niche. She testified that she hoped to achieve about $40,000 in Harvest Festival sales in 1994 and that the Harvest Festival dinnerware was one of a small number of lines that was going to be displayed front and forward during October and November. As for future sales, Donnell noted, "we really didn't know how the product was going to produce in our stores, and it would have been difficult to make future projections without that information." When asked whether she would have considered it reasonable in 1994 to anticipate a doubling and redoubling of sales in 1995 and 1996, Donnell answered, "I did not feel comfortable making a future projection before seeing a sales result." When pressed further on whether it was reasonable to expect doubling and redoubling of sales in the next two years, Donnell agreed that such projections would have been "sheer speculation."

Barbara Cotterman, who was the dinnerware buyer for the Betty Crocker catalog division of General Mills and who made the decision to carry Harvest Festival dinnerware in the fall 1994 catalog, testified to liking the Harvest Festival dinnerware "very much" right from the start. In her dealings with Hemmerich, Cotterman projected that General Mills would purchase approximately $69,480 worth of Harvest Festival dinnerware to cover sales from the 1994 catalog. Based on this projection, and in accordance with General Mills' purchasing procedures, Cotterman placed an order for approximately

---

**3.** Carson Pirie Scott operates department stores under the names Boston Store, Carson Pirie Scott, and Bergner's. During the relevant time period, Carson Pirie Scott operated a total of 51 stores in three states, 44 of which carried housewares.

$36,000 worth of dinnerware.[4] The Harvest Festival recall was commenced within a matter of a couple weeks after the fall 1994 Betty Crocker catalog was released. When asked by Mid–America's counsel whether General Mills had sufficient sales information about how Harvest Festival dinnerware was selling to draw any reliable conclusions as to how the line would have sold in the absence of a recall, Cotterman replied, "No. It was very early. It was way too early to make a full projection off of a couple weeks of selling."

Like these other buyers, Robert Coviello, co-founder and board member of Kitchen Etc., testified as to his favorable expectations for the Harvest Festival dinnerware line, stating, "I was particularly high on the pattern and the [collectibility] concept and I thought it would be very successful, and we placed a large order for eight stores in the first year on a collectible pattern and bought nearly every accessory." Moreover, Coviello testified that he intended to display the Harvest Festival dinnerware in the front of Kitchen Etc.'s seasonal area and had the line earmarked for a half-page ad in Kitchen Etc.'s November catalog. As it turned out, the Harvest Festival dinnerware only made it out on to the floor of two Kitchen Etc. stores before being recalled. The dinnerware was pulled after being on the shelves for about one week. Coviello stated that he was not sure how the dinnerware sold during that week, noting "[i]t was too early for us to get a handle on it." He testified that the Harvest Festival dinnerware was the first Thanksgiving-themed dinnerware line he had ever ordered and he had no long-term projections as to how a Thanksgiving-themed line would sell. He simply stated, "We were very confident in the success of this pattern." Coviello also testified that he would not have ordered Harvest Festival—or any other line—if he did not think it would sell; he acknowledged, however, that he has made mistakes before. As with all the other buy-

ers, Coviello testified that he had no commitment to purchase Harvest Festival dinnerware beyond his initial order and that he was going to wait and see how the line sold in 1994 before making any order for the following years. He also testified that he had no idea of how Harvest festival would have sold and he agreed that any such estimate would be "total speculation." With respect to Hemmerich's projections, Coviello agreed that they were nothing more than speculation, but he added, "I think they're reasonable."

J. Patrick Mulvaney, dinnerware buyer for Reading China & Glass, testified that he felt that Harvest Festival dinnerware filled a niche because there were not many dinnerware patterns that identify themselves as a fall or Thanksgiving-type pattern; Mulvaney also liked the line's vivid coloration. Mulvaney purchased Harvest Festival for five of the seven Reading stores. It was the only new non-Christmas seasonal pattern Reading carried in 1994. Mulvaney testified that the product was received at several of the stores in mid-September and that some of the stores actually had the dinnerware on display at the time of the recall. Mulvaney specifically testified as to the Harvest Festival sales experience of a Reading store in Boaz, Alabama where "because of the aggressive nature that the store manager takes upon seasonal items, because he is a very good seasonal store, ... [he] put the merchandise out on the store and had immediate sales on it." Although Mulvaney was not able to state precisely what percentage of product was actually sold by the Boaz store, he estimated that it was a total of five twelve-piece starter sets, and he remarked, "it was, at least it seemed anyway at that location, to be successful." When asked by Mid–America's counsel what conclusions he had drawn with respect to the "acceptability of the Harvest Festival dinnerware to [Reading's] customers" based on the Boaz sales, Mulvaney replied, "[t]he Alabama store is a successful dinnerware type store location, and based on what happened in Alabama, I felt that the

---

**4.** Cotterman testified that it was General Mills' practice to project how much product it expected to purchase over a given period of time and then to place an initial order for some percentage (generally 30–50 percent) of that projection. If

initial sales met expectations, an order for the remainder would then be placed; conversely, if the product did not perform, General Mills would not order additional product. Future purchases were "based on performance."

product would have been successful throughout our—throughout the stores that I placed it in." Later in his testimony, Mulvaney indicated that some of the Harvest Festival dinnerware was also sold by a Reading store in Florida. Then, based on the limited sales experience that the line experienced, Mulvaney reiterated, "with the success in those two stores, I would have deemed it a viable pattern through that season." Reading had not made any commitment to purchase Harvest Festival dinnerware beyond the 1994 season.

Raymond Brooks, a divisional merchandise manager for Dillard's Department Stores, who oversees a team of seven buyers and who has direct dinnerware buying responsibility for approximately 28 Dillard's stores located in the Midwest, testified that when Hemmerich first presented the Harvest Festival dinnerware to him, he thought it was worth pursuing because seasonal merchandise was enjoying great success in other areas (such as table linens and giftware) and the dinnerware seemed to fill a void. Brooks indicated to Hemmerich that the line had "a lot of potential" and he invited Hemmerich to present the line at one of Dillard's buying markets. Brooks testified that the reaction of his buyers to the line at the market was "mixed ... we had seven people in the room so we had seven different opinions. I'd say it went from very excited to this could be a total disaster. It covered the spectrum.... I would say more were positive than were negative." For his part, Brooks was consistently positive about the line. In conjunction with his buyers, Brooks decided to purchase the line and to carry it as a corporate line at about 117 Dillard's stores that were considered major market stores. Brooks described the decision to carry the line only at the major market stores (as opposed to all of the approximately 225 Dillard's stores) as a compromise reached in light of the fact that some of the buyers had more confidence in the line than others. The Harvest Festival dinnerware was the only new seasonal line taken on by Dillard's at the corporate level for the fall 1994 season; and, Brooks described the $126,000 order placed by Dillard's as a sizeable initial order. Brooks testified that the

line was to be displayed in Dillard's 1994 major markets catalog and featured front and forward in the stores. When asked whether he had any views about the line's long-term sales potential, Brooks stated, "[t]he conversation from the very beginning was that we viewed this as a long-term project and if we would have success coming out of the gate onward, we would like to develop additional product as an extension to the line." Brooks further testified that his "hopes and expectations" were that the line would develop into a successful collectible line. Nevertheless, Dillard's did not make any commitments to place future orders with Mid–America for Harvest Festival dinnerware beyond the fall 1994 season. Earlier in his testimony, Brooks acknowledged that of the new seasonal patterns that he took on during the years in which he was responsible for the fine china division, not one of the five patterns met sales expectations and only one lasted more than one year. Brooks believed that one pattern lasted two years.

Brooks had no personal knowledge about when the Harvest Festival line actually made it on to the shelves at Dillard's. He testified that at the 28 or 29 stores for which he was directly responsible, the goods never actually made it to the stores at all before being recalled. It was his understanding, however, that the product did reach some of the stores before being pulled. When asked whether he could draw any conclusions as to whether the product would sell well, Brooks responded: "I know goods did reach the stores. I know some sales were made, but in no way was there enough to make a conclusion at this point." Brooks also agreed that there simply was not enough time to be able to draw any conclusions one way or the other as to how successful the line would be. Brooks was also asked his opinion, based on his many years in the industry, whether the dinnerware line would have been successful had there been no problem with lead. He answered: "That's very difficult to answer. There's a lot of times I thought I made the right call and it's wrong. Obviously, I wouldn't have let it get to the point that it got to if I didn't think it would be successful. That's my judgment call only. Not necessar-

ily does that mean that every time I make a judgment call that I'm correct."

Mid–America's damages expert, John Nevin, a professor at the University of Wisconsin School of Business, testified that "the willingness of retailers to buy the line and not only stock the line but to put it front and forward and promote it heavily ... says that the line was perceived as going to be very successful for these retailers." Nevin noted that it was rare to find a small company like Mid–America getting access to the large chains, adding "[t]hey had to really like this product to take this small unestablished supplier on and feature [its] product." Nevin also emphasized the significance of the fact that most of the retail buyers indicated that they were going to feature the Harvest Festival dinnerware in "front and forward" displays, noting, "[t]he products that sell are those that are promoted and put out front where people actually see the products.... A lot of products just hide on the shelf and people don't see it. [The Harvest Festival dinnerware was] not just bought, they were going to be featured front and forward by almost all of these major retailers, and that would dramatically affect the sales success of these products." Nevin stated that he was unaware of any evidence that the Harvest Festival dinnerware line would not have been a success and that "[m]y opinion is that this product would have been a success[,] [a]ll the evidence in the case says it would have been a success." In formulating his opinion as to whether Harvest Festival dinnerware would have been a success, Nevin relied chiefly on the views expressed by Hemmerich and the retail buyers. Discussing his reliance on Hemmerich's opinions, Nevin observed, "[in] this particular case we're not fortunate to be able to look at how the product did six months or a year out, because the product was never allowed to be sold, we have to go back and try and create an understanding of the experience this line was experiencing until it was pulled off the marketplace. And the supplier, Mid–America's experience, their plans, their projections are important."

In attempting to estimate the success, in dollars, that Harvest Festival would have enjoyed, Nevin reviewed Hemmerich's forecasts and various statements he made before the lead problem was discovered concerning his expectations for the line. For instance, Nevin reviewed certain projections made by Hemmerich in connection with a loan application, which suggested that 1995 and 1996 sales of Harvest Festival would be in the areas of $780,000 and just under $1.2 million respectively.[5] In addition to Hemmerich's forecasts, Nevin also took note of a statement by Hemmerich that he expected sales of Harvest Festival to exceed that of the successful Johnson Brothers' "Friendly Village" seasonal line. Nevin also placed some significance on the fact that one of Hemmerich's early order size estimates turned out to be fairly close to the actual order size.[6] Finally, Nevin placed significance on the fact that the line was intended to be a collectible line with pieces added over time.

Nevin prepared a table reflecting his projections of Mid–America's lost future profits encompassing the years 1995 through 2003. (The table also reflected an estimate of lost profits for 1994, which was based on Mid–America's actual sales for that year.) Nevin testified that he considered ten years to be a reasonable estimate of the line's life based on the fact that it was intended to be a collectible line. Nevin's projections for 1995 and 1996—$700,000 and $1.2 million, respectively—tracked Hemmerich's estimates. For 1997 and 1998, Nevin explained his projections as follows: "There was testimony in the case that the sales would get to three million

---

5. The actual figures with which Nevin was working reflected Hemmerich's projections concerning his expenditures for china. The 1995 and 1996 figures were $390,000 and $590,000, respectively. Nevin assumed that Mid–America's sales revenues would be approximately twice the amount spent for the china. Nevin believed that the expenditure figures included a small amount (approximately $10,000) for china other than the Harvest Festival line. Therefore, the $780,000 and $1.2 million sales projection figures for Harvest Festival should be reduced by $20,000.

6. Specifically, in June 1993, Hemmerich estimated that he would place an initial order of twenty-five hundred 20–piece sets; as it turned out, Hemmericeh actually ordered a total of twenty-six hundred 12–piece and 16–piece sets.

dollars within five years, so the fourth year [1997] I took basically a position that was halfway between the 1,200,000 in '96 and the three million in 1998 which had been forecast." Nevin further explained that because there had been no testimony concerning the growth of sales after 5 years, he held the gross sales figure constant at $3 million for the years 1999 through 2003. Using a 20 percent net profit figure (which he described as conservative) and an 8 percent present value discount rate, Nevin calculated a total lost profit figure for the Harvest Festival dinnerware in the ten-year period (1994 through 2003) to be $3,326,601.[7] Nevin stated that his sales projections reflect his conclusion that Harvest Festival would have been a successful line. When asked how his sales projections compared to other successful collectible dinnerware lines, Nevin observed that LaReau reported the sales of two International China lines, Heartland and Marmalade, to be about $20 million in 1987 and $14 million in 1988, respectively. He also noted that LaReau reported the 1981 sales of Johnson Brothers' Harvest Festival line to be $3 million (which he estimated was equivalent to about $6 million in 1995). Thus Nevin concluded that his figures "reflect a successful line, but I don't think they're anywhere near the magnitude of other successful lines that have been talked about."

On cross-examination, Nevin acknowledged that he had not conducted any research on the dinnerware industry and he had not conducted any market research or analysis on the Harvest Festival dinnerware. Nor had he gathered any information regarding sales successes of other seasonal dinnerware patterns, other than speaking with Hemmerich or LaReau; specifically, he had not examined the sales histories of comparable dinnerware lines. (In this regard, Nevin testified that he had asked plaintiff's counsel if there was any such information and was told there was none; he also indicated that such information

was proprietary.) Indeed, Nevin agreed that his calculations "were all based on what Mr. Hemmerich expected Mid–America to do with the Harvest Festival dinnerware line." In connection with his reliance on Hemmerich's sales projections, Nevin acknowledged that he had not done anything to verify the accuracy of those projections other than to read the documents (*e.g.*, various depositions, including those of LaReau and some of the buyers) that exist in this case. Nevin also acknowledged testifying during his deposition that "[i]t's impossible to tell the accuracy of the projections because customers never got a chance to behave with respect to this product, and although the buyers were optimistic and put it in their [stores], the product could have been more successful than their projections or less successful in reality, but we can't go back and re-establish reality." In support of his reliance on Hemmerich's projections, Nevin cited the acceptance Harvest Festival had achieved among major retailers and their plans for the line, and, he noted, "[e]verything I saw was extremely favorable." Nevin conceded that one cannot use comparable products for purposes of calculating lost profits because it is difficult to determine what a comparable product is and whether the product was introduced during the same economic conditions. In a related vein, Nevin acknowledged that other than the testimony he was aware of from this case, he had no knowledge of the sales volume of Johnson Brothers' Friendly Village line, he did not know the first year sales for that line, and he did not know the growth rate of that line over its first ten years. He also was not familiar with Johnson Brothers' capabilities and resources.

Mogi called two witnesses, George Meadows, a damages expert, and Gayle Adamowicz, an expert who testified as to buying practices in the tabletop industry.[8] Meadows, who serves on the University of Wisconsin–Milwaukee economics department faculty, criticized Nevin's projections of lost

---

7. Employing similar methodology, Nevin calculated lost future profits from sales of Harvest Festival table linens resulting from the dinnerware problem to be $197,940. Nevin assumed the linen sales would equal $150,000 per year for each of the years 1995 through 2003.

8. To accommodate his schedule, Meadows' testimony was received out of order during the course of Mid–America's case in chief.

future profits on a number of grounds.[9] To begin with, Meadows presented historical data concerning Mid–America's sales and income and found Nevin's projections "strongly at variance with the actual historical experience of this firm." Meadows also criticized Nevin's projections because of Nevin's failure to conduct market research—in particular, his failure to determine the size of the relevant market, market share, and the likely response of competitors to a new successful product. Meadows specifically noted that an analysis of the experience of other vendors when launching new dinnerware lines would provide very important information because it would give some basis for projecting whether the instant product line might prevail. Meadows noted that Nevin apparently did not conduct any analysis of patterns in the introduction of new dinnerware lines. With respect to Nevin's use of Hemmerich's sales projections, Meadows stated that Nevin "could and should have done additional work to corroborate" those projections: "I think he should have tried to analyze what market share Mid–America might logically have had in this particular market for tableware, seasonal tableware. I think he should have tried to discover more about the experience of other fall/Thanksgiving-themed patterns. There apparently are several in that market." Meadows also testified that Hemmerich's forecasts of future sales to specific retailers could not be regarded as a reliable basis for making lost profit projections.

On cross-examination Meadows acknowledged that "there clearly were lost profits," but that he was merely critical of the way Nevin calculated them. Meadows also stated that he had no opinion as to whether the Harvest Festival dinnerware line would have been successful if not for the lead problem. Meadows also had no basis for criticizing Nevin's assumption that Harvest Festival would have been successful. With respect to the magnitude of Nevin's sales projections, Meadows testified that he would find it sig-

nificant and would be more comfortable with the figures if someone as knowledgeable in the industry as LeReau testified that they were reasonable figures for a successful collectible dinnerware line. (Meadows was not present for LaReau's testimony—summarized above—and was unaware that LeReau had so testified.) When asked if he had an understanding as to the importance of retail buyers in determining the level of success of a new dinnerware line, Meadows acknowledged that he understood buyers were "very important in the process."

Mogi's second witness, Gayle Adamowicz, previously worked as an assistant buyer and buyer in the tabletop housewares department for Mervyn's, a mid-priced department store based in California. She also previously worked as an account executive handling dinnerware sales for International China. At the time of trial, Adamowicz was Director of Marketing for Meyer Corporation, the third largest cookware manufacturer in the world. Adamowicz testified that in this industry retailers do not enter into purchasing commitments beyond the upcoming season because "[i]t's simply too risky. It's a very dynamic retain environment ... and there are a lot of changes and there are customer preference changes as well, so to extend beyond that wouldn't make a lot of business sense because things change daily." As examples of successful patterns that experienced sudden drop-offs in sales, Adamowicz identified International China's Heartland and Marmalade lines, which experienced a sharp and unexpected sales decline in 1988. Adamowicz testified, based on her experience, that the life of a dinnerware pattern is not predictable; rather, it varied pattern to pattern. Even when a pattern had a successful sales history, "the consumer was the final vote." Specifically addressing Thanksgiving or fall-themed dinnerware, Adamowicz testified that when she was tabletop buyer for Mervyn's she purchased two fall-themed patterns, "Gold Leaf" and "Embossed Leaf." Mervyn's purchased approximately $60,000 of Gold Leaf and $25,000 to $30,000 of Embossed Leaf dinnerware. Mervyn marketed

---

**9.** Meadows also criticized Nevin's calculations of 1994 lost profits. However, because Mogi does not contest the jury's determination regarding 1994 profits, Meadows' critique of the 1994 figures is immaterial for present purposes.

both of these patterns front and forward; however, neither pattern was successful and neither was carried for more than one year. When asked her opinion as to the marketability of a Thanksgiving-themed dinnerware, Adamowicz answered, "it's risky." As to whether it is possible to project future sales of a dinnerware pattern, Adamowicz stated, "My opinion is that it is not possible until the customer votes for it." Adamowicz stated that one needs a sales history in order to project out future sales. She further stated that the fact that a single store in a single chain had some retail success with a pattern, could not support the inference that the pattern would be successful in other stores within the same chain. Similarly, Adamowicz testified that success in one chain does not necessarily translate into successful sales at another chain. As an example, Adamowicz noted that the Embossed Leaf pattern that failed at Mervyn's was a great success at Bloomingdales the previous year—notwithstanding the fact that Mervyn's sold it at a lower price. Adamowicz also noted that Mervyn's tested some of Mikasa's best selling patterns and found that Mervyn's customers "didn't vote for theme or [were not] going to buy those patterns in our floor." When presented with projections made by Hemmerich for the years 1995–1998, listing by customer how much Harvest Festival dinnerware he expected to sell, Adamowicz testified that in her opinion it was not possible to project sales in this manner with any degree of accuracy.